**KAHN SWICK & FOTI, LLC**

KIM E. MILLER
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

LEWIS S. KAHN
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Lead Plaintiff Charles
M. Francisco, III and the Class*

**DECOTIIS, FITZPATRICK, COLE
& GIBLIN, LLP**

VINCENT M. GIBLIN
Glenpointe Centre West
500 Frank W. Burr Boulevard, Suite 31
Teaneck, NJ 07666
Telephone: (201) 347-2136
Fax: (201) 928-0588

*Local Counsel for Lead Plaintiff
Charles M. Francisco, III*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID KANEFSKY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HONEYWELL INTERNATIONAL INC., DARIUS ADAMCZYK, and THOMAS A. SZLOSEK,<br><br>Defendants. | Civ. No. 2:18-15536-WJM<br><br>**LEAD PLAINTIFF CHARLES M. FRANCISCO'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Charles M. Francisco, III, individually and on behalf of all other persons similarly situated (hereinafter "Plaintiff"), by his undersigned attorneys, alleges in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint")[1] the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by its counsel which included, *inter alia*: (a) review and analysis of relevant filings made by Honeywell International Inc. ("Honeywell" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Honeywell's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning Honeywell; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## SUMMARY OF THE ACTION

1.     Plaintiff brings this federal securities class action individually and on behalf of all persons who purchased or otherwise acquired Honeywell securities from **February 9, 2018** through **October 19, 2018**, inclusive (the "Class Period"),

---

[1] This is the first and only amended complaint authorized by Plaintiff. *See, e.g.*, ECF No. 55-2 at ¶4; ECF No. 65-2 at ¶2.

and were damaged when the true facts were revealed, removing the artificial inflation from the price of the stock through a series of partial disclosures beginning on August 23, 2018 and ending with the final disclosure on October 19, 2018. Plaintiff is seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Honeywell, its President and Chief Executive Officer Darius Adamczyk, its Senior Vice President and Chief Financial Officer Thomas A. Szlosek, and Vice President of Corporate Finance Greg Lewis, who later replaced Szlosek as Chief Financial Officer (collectively, "Defendants"), during the Class Period.

2.      Honeywell has been at the epicenter of asbestos litigation for nearly two decades. In 1999, Honeywell acquired Bendix Friction Materials ("Bendix"), and with it took ownership of the substantial liabilities which arose from Bendix's use of asbestos while manufacturing brakes over a forty-year period beginning in 1939. In its annual Form 10-K report for 2017 dated February 9, 2018 (the "2017 10-K"), Honeywell stated its estimation of the Bendix-related asbestos liabilities was $616 million. This figure only included an estimated value of the claims to be asserted over a five-year time horizon, and therefore was a gross underestimation of the Company's true Bendix-related asbestos liabilities. Honeywell continued to use this five-year time horizon method of calculating the Bendix-related asbestos

liabilities in its quarterly statements released on April 20, 2018 and July 20, 2018. The truth came to light through a series of disclosures that Honeywell's actual Bendix-related asbestos liabilities were almost *three times* **higher—$1.703 billion**.

3.      Honeywell manufactured its initial Bendix estimates by manipulating the manner in which it was supposed to account for loss contingencies under Accounting Standards Codification ("ASC") Rule 450. Honeywell also ignored generally accepted accounting principles ("GAAP"), industry norms, and even its own processes for calculating asbestos-related liabilities for other segments of Honeywell's business. According to Honeywell, there were "certain factors unique to friction product asbestos claims," and for that reason the company claimed it was justified in giving investors a wildly misleading account of the risks arising from the Bendix-related asbestos liabilities. These unique factors were not as insurmountable as Honeywell initially claimed, however, as Honeywell was able to produce an accurate figure of its actual Bendix-related asbestos liabilities as soon as the SEC opened an investigation into the matter.

4.      Over the Class Period, Honeywell repeatedly provided investors with materially incorrect accounts of its Bendix-related asbestos liabilities and false descriptions of the company's internal controls over financial reporting and public disclosures. These misrepresentations were present in each quarterly and annual report that Honeywell filed with the SEC. As a result of these misrepresentations,

Honeywell's stock price during the Class Period was artificially inflated.

5.     On May 1, 2018, Honeywell began the process of spinning off two subsidiaries, Garrett Motion Inc. ("Garrett") and Resideo Technologies, Inc. ("Resideo"). In its registration statement filed with the SEC, Garrett revealed it had agreed to pay 90% of Honeywell's asbestos liability, up to $175 million annually, for a 30-year term. The registration statement contained Honeywell's calculation of the liability as $616 million. The registration statement did not become publicly available until August 23, 2018.

6.     After Garrett filed its May 1, 2018 registration statement, the SEC began an inquiry into the true amount of the Bendix-related asbestos liabilities on Honeywell's balance sheet. Through a series of non-public communications with Honeywell's in-house counsel, the SEC demanded an explanation as to why Honeywell limited its liability for asbestos claims to a five-year horizon. Eventually, on August 20, 2018, Honeywell admitted to the SEC that there was no basis for the five-year horizon, that the misstatement was caused by deficient internal controls, and that it was necessary to correct Honeywell's prior SEC filings. Honeywell revealed to the SEC that the true amount of its Bendix-related asbestos liabilities was **$1.703 billion,** almost ***three times*** **higher** as Honeywell had previously claimed.

7.     On August 23, 2018, investors began to discover the truth about the

Bendix-related asbestos liabilities. In a report on Form 8-K filed with the SEC before market hours, Honeywell disclosed that it needed to "revise[] its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims" and indicated that its Bendix-related asbestos liabilities would need to be increased by $1.083 billion (from $610 million to $1.693 billion as of June 30, 2018).

8.     Contemporaneously with the Form 8-K, however, Honeywell issued a press release announcing positive developments, including progress on its spin-offs. Honeywell announced the spin-offs would make payments to Honeywell under indemnification agreements that would offset Honeywell's related legacy liabilities by 90%, including both its environmental liabilities and Bendix-related asbestos liabilities. Thus, even though investors learned Honeywell would recognize over $1 billion more in liabilities from the Bendix-related asbestos litigation, they simultaneously learned of Honeywell's scheme to shift the majority of those liabilities to its new spin-off, Garrett. The press release also announced that Honeywell was increasing its full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20). Reacting to these favorable announcements, analysts largely considered "today's news as positive" and "expect[ed] the stock to outperform modestly on the back of the guidance raise and spin progress." Despite this aggressive attempt to minimize any sell-off resulting from its massive increase

in asbestos liability, Honeywell's stock price still declined from an opening market price of $151.30 per share on August 23, 2018 to an unadjusted closing price of $150.97 per share on August 24, 2018.

9.      The next disclosure came on October 10, 2018, during trading hours, when the SEC's Division of Corporation Finance released correspondence with Honeywell from August 14, 2018 and August 20, 2018 about Honeywell's accounting for the Bendix-related asbestos liabilities. Honeywell did not release these letters itself, and, in fact, had previously requested confidential treatment of the correspondence. The correspondence included an initial inquiry from the SEC and a response from John Tus, Honeywell's former Vice President and Controller. In his response, Tus admitted that Honeywell's internal controls for determining the Bendix-related asbestos liabilities had been deficient, and intentionally so. Tus confirmed that, despite ASC 450 being "the authoritative accounting standard under U.S. GAAP concerning loss contingencies," Honeywell "had not appropriately applied the provisions of ASC 450" due to the fact that its liability estimates did not "reflect the full term of the epidemiological projections in the measurement of such liability."

10.      Contrary to ASC 450, Honeywell had been estimating its Bendix-related asbestos liabilities for a five-year period (or five-year horizon) only. Honeywell's estimates, therefore, disregarded all potential for liability arising more

than five years in the future. As admitted in its response, Tus explained that Honeywell "inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. [Honeywell] had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. [Honeywell] did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

11.     In other words, Honeywell had the necessary data and properly valued its asbestos-related liability, but deliberately chose to disclose only a fraction of that liability to the public. As the SEC concluded, there was no conceptual basis for applying ASC 450 in the manner Honeywell did. Honeywell thus directly contradicted the purpose of U.S. GAAP and the federal securities laws, which is to create transparency and protect investors and the public from material misrepresentations such as the inaccurate information about Honeywell's asbestos liabilities.

12.     The information contained in Honeywell's correspondence with the SEC was material and, accordingly, its release resulted in a sharp decline in the price of Honeywell's stock. From an opening market price of $155.76 per share on

October 10, 2018, Honeywell's stock price fell to an unadjusted closing price of $148.86 per share on October 11, 2018. It would have fallen further, but for another attempt by Honeywell to conceal the truth behind its accounting scheme by hosting an "Investor Showcase and Technology Demonstration" for its new spin-off, Resideo. Honeywell did not discuss the released correspondence, in this presentation or otherwise.

13. On October 19, 2018, Honeywell was no longer able to keep investors in the dark about its Bendix liability accounting scheme. Before market hours, the company released its quarterly report on Form 10-Q for the third quarter of 2018 (the "Q3:18 10-Q"). In it, Honeywell provided investors with the new Bendix-related asbestos liabilities figures as well as the fact that the SEC's Division of Enforcement had commenced an investigation into Honeywell's Bendix accounting on September 13, 2018.

14. This was material news for Honeywell investors. On October 19, 2018, numerous publications reported on the news that the SEC had opened an investigation. The *Wall Street Journal* published an article titled *SEC Opens Investigation Into Honeywell's Asbestos Accounting*. In pertinent part, the article stated that the "Securities and Exchange Commission ha[d] opened an investigation into the company's accounting for asbestos-related liabilities" following "discussions with the SEC that prompted it to correct and restate its

asbestos liabilities by about $1.1 billion more than its prior estimate." The *Wall Street Journal* included this article in its print edition on October 20, 2018 under the headline "SEC Opens Probe of Honeywell." *Reuters* published an article with similar language, adding "[t]he company has also revised its 2017 reported earnings per share lower by 14 cents to $2.00." The *Reuters* article was picked up by a number of other outlets, including *Business Insider*.

15.     *MarketWatch* published an article in the afternoon, before market close, titled "Honeywell's stock turns lower after SEC accounting investigation disclosed." The article stated:

> Shares of Honeywell International Inc … took an afternoon dive Friday, after the company disclosed that the Securities and Exchange Commission had opened an investigation into its accounting practices. The stock fell 0.7% in recent trade, after being up as much as 1.6% intraday after the diversified industrial company beat third-quarter earnings expectations. Honeywell said in its quarterly 10-Q filing that after a review of its accounting of accruals for the legacy Bendix asbestos-related liability for unasserted claims, the SEC advised Honeywell on Sept. 13 that an investigation was opened.

This article linked the fall in stock price with the news that the SEC had launched an investigation into Honeywell's accounting practices.

16.     Following Honeywell's disclosure of the new Bendix-related asbestos liability figures and the SEC investigation, the company's stock price declined substantially. Honeywell's opening stock price on October 19, 2018 was $151.26 per share. From there, it declined to an unadjusted market closing price of $147.88

per share on October 22, 2018 (the following trading day), and continued to fall further on October 23, 2018 ($145.93 unadjusted close) and October 24, 2018 ($140.83).

17.     Defendants knew and/or recklessly disregarded the fact that their SEC filings in the first half of 2018 concealed material information from investors about Honeywell's Bendix-related asbestos liabilities. As the truth concerning Defendants' accounting scheme came to light, Honeywell's stock price declined significantly. From a Class Period high of $161.28 per share, Honeywell's stock eventually fell to $140.83 per share following the end of the Class Period. The rise and fall of Honeywell's stock amounted to a total market capitalization loss of more than $14.8 billion.

18.     Since Honeywell effectuated the spin-off of Garrett on October 1, 2019 and revealed the true amount of the Bendix-related asbestos liabilities on October 19, 2019, Garrett has failed to succeed as an independent company. On February 20, 2019, in connection with its preparation of its Form 10-K for the year ended December 31, 2018, Garrett self-identified and reported a material weakness in its internal controls regarding its indemnification obligations to Honeywell with respect to the Bendix asbestos liabilities. Garrett stated it had been "unable to independently verify the accuracy of the certain information Honeywell provided to us that we used to calculate the amount of our Indemnification Liability."

19.    Unable to come to a resolution with Honeywell, on December 2, 2019, Garrett filed an action against Honeywell in the Commercial Division of the Supreme Court of the State of New York, County of New York. The complaint alleged that the indemnification agreement was unlawful, "so one-sided as to be manifestly unconscionable," and had been negotiated by a Honeywell in-house lawyer who breached her fiduciary duty to Garrett. The complaint states "Honeywell and Adamczyk sought to use the spin-off to convince the market that Honeywell's legacy Bendix-related asbestos liability, which exceeded a billion dollars and had saddled the company for decades, would no longer impact Honeywell's balance sheet and future earnings."

20.    Plaintiff and other Class members sustained significant damages as a result of Defendants' fraudulent conduct complained of herein.

## JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.    Venue is proper in this District pursuant to § 27 of the Exchange Act

and 28 U.S.C. §1391(b), as Honeywell's principal executive offices are located within this Judicial District and a significant portion of Defendants' business, actions, and the subsequent damages, took place within this District.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

25.     Lead Plaintiff Charles M. Francisco III purchased Honeywell securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transactions in Honeywell is attached hereto as Exhibit A and incorporated herein by reference.

26.     Defendant Honeywell is a multinational conglomerate that produces a wide range of consumer and industrial products, engineering technology, and aerospace systems. Honeywell is incorporated under Delaware law. During the Class Period, Honeywell's principal executive offices were located at 115 Tabor Road, Morris Plains, New Jersey 07950. Honeywell's common stock is traded on the NYSE under the symbol "HON".

27.     Defendant Darius Adamczyk ("Adamczyk") has served at all relevant times as Honeywell's President and Chief Executive Officer.

28.     Defendant Thomas A. Szlosek ("Szlosek") has served as Honeywell's Senior Vice President and Chief Financial Officer until his retirement on August 3, 2018. Honeywell announced Szlosek's intention to "retire from the Company for personal reasons" in a May 1, 2018 Form 8-K, filed the same day that Garrett filed its Draft Registration Statement with the SEC. Thereafter, Szlosek promptly joined Avantor, Inc. as Executive Vice President and CFO.

29.     Defendant Gregory P. Lewis ("Lewis") was the Vice President of Corporate Finance at Honeywell and assumed the role of Senior Vice President and Chief Financial Officer beginning on August 3, 2018.

30.     Defendants Adamczyk, Szlosek, and Lewis are collectively referred to herein as the "Individual Defendants."

31.     Honeywell is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged herein, including the false and misleading statements made by the Company's officers and agents, as alleged herein, as the maker of such statements and under the principle of *respondeat superior*. The scienter of the Individual Defendants and other employees and agents of Honeywell is similarly imputed to Honeywell under *respondeat superior* and common law agency principles.

13

32.     Honeywell, Adamczyk, Szlosek, and Lewis are referred to herein, collectively, as the "Defendants."

33.     The Individual Defendants, because of their positions with Honeywell, possessed the power and authority to control the contents of Honeywell's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Honeywell's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Adamczyk and Szlosek personally certified the SEC filings containing the misleading statements. Lewis participated in an Investor Conference Call on July 20, 2018 in which he made materially misleading statements.

34.     The Individual Defendants, because of their positions and access to material non-public information available to them, knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## RELEVANT NON-PARTY

35.     "Garrett" refers to Garrett Motion Inc., f/k/a Garrett Transportation

Systems Inc. Garrett was Honeywell's wholly-owned Transportation Systems division until the spin-off was completed on October 1, 2018. Honeywell stockholders received one share of Garrett for every ten shares of Honeywell they owned.

36.     Honeywell managed the day-to-day affairs of Garrett prior to the spin-off. Many of the Honeywell employees who had been managing Garrett prior to the spin-off continued managing Garrett after the spin-off. During the spin-off process, Su Ping Lu, Honeywell's Assistant General Counsel and Assistant Corporate Secretary, acted as sole director for Garrett.

37.     Honeywell was responsible for Garrett's accounting prior to the spin-off, including in particular the Bendix-related asbestos liabilities estimate that appeared in Garrett's and Honeywell's filings with the SEC. Indeed, as confirmed by Garrett's independent auditor, Deloitte & Touche LLP, the financial statements included within Garrett's initial registration statement were derived from Honeywell's accounting records. Further, as explained by Garrett in its most recent proxy statement dated April 24, 2019, Garrett "was not a standalone entity and did not have a board of directors or an audit committee" prior to the spin-off and, therefore, relied entirely on Honeywell for all corporate accounting and disclosure purposes relating to the Bendix-related asbestos liabilities estimate.

38.    Additionally:

(a)    Olivier Rabiller, who currently serves as Garrett's President and Chief Executive Officer, served as President and Chief Executive Officer of Honeywell's Transportation Systems division prior to the spin-off;

(b)    Russell James, who now serves as Garrett's Vice President and Corporate Controller (Principal Accounting Officer), was the Corporate Controller for the Transportation Systems division prior to the spin-off;

(c)    Peter Bracke, who now serves as Vice President Finance for Garrett, served as Vice President Finance for Honeywell prior to the spin-off and Acting Chief Financial Officer and Principal Accounting Officer for Garrett during the spin- off;

(d)    Craig Balis served (and serves) as Chief Technology Officer of Garrett both before and after the spin-off;

(e)    Pierre Berthelet served (and serves) as Senior Vice President Marketing & Product Management of Garrett both before and after the spin-off;

(f)    Martin Schiesser served (and serves) as Vice President and Chief Digital & Information Officer of Garrett both before and

after the spin-off; and

(g)    Fabrice Spenninck served (and serves) as Senior Vice President, Chief Human Resources and Communications for Garrett both before and after the spin-off.

39.    On December 2, 2019 Garrett filed an action against Honeywell in the Commercial Division of the Supreme Court of the State of New York, County of New York "seek[ing] relief from an unenforceable and unconscionable indemnification agreement, which includes illegal covenants and purports to saddle Garrett with over a billion dollars in asbestos liability unrelated to its business."

## SUBSTANTIVE ALLEGATIONS

### A.    Background.

40.    Honeywell is a defendant in asbestos-related personal injury actions related to two predecessor companies, North American Refractories Company ("NARCO"), which was sold in 1986, and Bendix, which was sold in 2014.

41.    NARCO produced refractory products (bricks and cement used in high temperature applications). Claimants from NARCO asbestos liabilities consist largely of individuals who allege exposure to NARCO asbestos-containing refractory products in an occupational setting. Rather than the traditional tort system, NARCO claims are processed through a Trust established under federal bankruptcy laws. The model used for determining how much money was placed in

this trust was based on a 15-year time horizon because, as Honeywell explains, "it represented our best estimate of the time period it would take for the Trust to be approved by the Bankruptcy Court, become fully operational and generate sufficiently reliable claims data … to enable us to update our NARCO Trust asbestos accrual, including by potentially applying a different time horizon to the projection." The trust became operational in 2013; there was no claims data available to Honeywell before that time.

42.     Bendix manufactured automotive brake parts that contained chrysotile asbestos in an encapsulated form. Despite known health hazards, Bendix used asbestos in its brake- and clutch-pad products until 2001. Claimants of Bendix asbestos liabilities consist largely of individuals who allege exposure to asbestos from brakes from either performing or being in the vicinity of individuals who performed brake replacements. Unlike with NARCO, the Bendix claims are processed traditionally through the tort system.

43.     Although Honeywell sold Bendix in 2014, Honeywell has been sued in tens of thousands of cases alleging exposure to asbestos from Bendix products, and between Honeywell and its insurance companies, over $1 billion has been spent to resolve the claims. Despite having far more claims data than was available for the NARCO Trust, Honeywell only used a five-year time horizon, rather than the 15-year time horizon used for NARCO, to estimate its Bendix-related asbestos

liabilities.

**B.      Asbestos Is Highly Toxic and Has Resulted in Hundreds of Billions in Liability**

44.      Asbestos is a naturally occurring mineral fiber that occurs in rock and soil. Asbestos fibers are soft and flexible yet resistant to heat, electricity and chemical corrosion. Pure asbestos is an effective insulator, and it can also be mixed into cloth, paper, cement, plastic and other materials to make them stronger.

45.      Because of its fiber strength and heat resistance asbestos has been used in a variety of building construction materials for insulation and as a fire retardant. Asbestos has also been used in a wide range of manufactured goods, mostly in building materials (roofing shingles, ceiling and floor tiles, paper products, and asbestos cement products), friction products (automobile clutch, brake, and transmission parts), heat-resistant fabrics, packaging, gaskets, and coatings.

46.      Asbestos is toxic to human beings and results in a range of known effects, from asymptomatic scarring of the lungs (pleural plaques) to functionally limiting disease, including asbestosis and fatal cancers of the lining of the chest, heart, abdomen and lungs. Asbestosis and lung cancer are generally related to the quantum of exposure and are found among workers. Mesothelioma is a cancer primarily of the pleura and peritoneum and can result from only trivial exposure and, thus, affects both workers and the general population, often presenting

decades following exposure.

47.    The health-related risks of exposure to asbestos have been documented since at least the 1st century AD, but it was not until several landmark scientific studies in the late 1950s through to the early 1960s that a definitive link between asbestos and asbestosis, lung cancer and mesothelioma was generally accepted. While the potency of different types of asbestos is debated, evidence has shown that all types of asbestos are carcinogenic to human beings.

48.    In the US, the maximum exposure to asbestos is said to have occurred between the 1930s and the 1960s, with consumption peaking in 1973. Deaths from asbestos-related disease peaked between 1992 and 1997, which is consistent with the known lag between exposure and mortality. The spectre of mass litigation strategies still looms over companies.

**C.    Accounting for Liabilities.**

49.    In order to account for the mass amount of asbestos litigation, corporate reporting includes mandated annual reports. Accounting frameworks provide the means for disclosure of both financial and non-financial information. Financial disclosures are generally mandated through accounting standard regimes and promulgated standards such as International Financial Reporting Standards (IFRS) and U.S. GAAP.

50.    ASC 450, the authoritative accounting standard under U.S. GAAP

concerning loss contingencies, provides that a company must accrue for a loss when that loss is both probable and reasonably estimable (ASC 450-20-25- 2). If a loss is reasonably possible but not probable and is reasonably estimable, then ASC 450-20-50-3 directs that a company disclose that contingent loss but not record an accrual. ASC 450-20 makes clear that the same standards for accrual and disclosure of contingent liabilities apply to both unasserted claims as well as asserted claims. Specifically, ASC 450-20-55-14 provides, "[w]ith respect to unasserted claims and assessments, an entity must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. If an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required by paragraph 450-20-25-2." Additionally, "If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount." (ASC 450-20-30-1).

51.     Prior to August 2018, Honeywell accounted for Bendix related asbestos liabilities for a limited five-year horizon. As Honeywell would later

21

admit, this accounting policy did not comply with the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims. This is because Honeywell possessed data that could yield a probable and reasonably estimable projection of liability under ASC 450 for the full term of the epidemiological projections beyond just five years.

52.     Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical claims information on which to rely when estimating a future projection of liability. Each year, Honeywell has a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates. For Bendix, historical claims data is readily available on a real-time basis through its day-to-day experience in the tort system. The robustness of this data supports the conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450.

53.     Historically, Honeywell's accounting process for recognition of the Bendix asbestos liability begins with notification of claims being asserted against Honeywell via outside counsel which also serves as the Bendix claims administrator. It continues with the processing of the claim and case resolution (either dismissal or settlement), the processing of any applicable settlement

payments, the accounting for claims filings, dismissals and payment, the insurance recovery process, and ends with the related financial reporting and financial statement disclosures.

54.     In addition to a liability for pending claims (claims filed in the tort system against Honeywell as of the financial statement date), Honeywell assesses the potential liability from unasserted claims (claims expected to be filed against Honeywell in future periods). The pending claims balance, including data on claim filings, settlements and dismissals, are reported to Honeywell on a monthly basis by its claims administrator.

55.     The amount of the pending claims liability is calculated monthly by Honeywell representing a product of the pending claims balances by disease category multiplied by the average resolution values by disease category. The average resolution values by disease category are based on actual settlements and dismissals by disease category for the previous five years. These average resolution values are monitored by Honeywell quarterly and updated in the fourth quarter of each year.

56.     Honeywell utilizes a third-party specialist to determine its liability for unasserted claims based on the following: epidemiological projections of the future incidence of disease; historical claims rate experience by disease category in the tort system; and historical resolution values (settlements and dismissals) by disease

category.

57.    The liability for unasserted claims is updated by the third-party specialist in the fourth quarter each year based on the factors described above. The historical claims information is provided to the third-party specialist by the third-party claims administrator.

58.    As such, Honeywell's estimated value of Bendix related liabilities included future anticipated claims based on historical claims filing experience and dismissal rates, disease classifications, and average resolution values in the tort system for the previous five years.

59.    In addition to historical data, Honeywell, its third-party specialists, and its outside legal counsel considered emerging trends and discoveries. According to Honeywell's August 20, 2018 letter to the SEC "[s]ignificant weight was placed on the emerging science and studies that indicated the nature and application of the asbestos used in manufactured automotive brake parts by Bendix does not cause disease. Management also focused on evidence suggesting improvements in the tort system with regards to the resolution of asbestos claims (this information and insights having been provided to management by outside counsel)." Due to the evolving nature of these trends, Honeywell claimed it could not determine a probable and reasonably estimable future liability beyond five years in the future.

24

60.     However, this claim was incorrect, as the wealth of historical data available to Honeywell and its third-party specialist allowed it to later estimate future liabilities out to the year 2059. By only presenting the liabilities for a five-year horizon, Honeywell, by its own admission, "did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence." August 20, 2018 letter from Honeywell to SEC.

**D.     The SEC Challenges Honeywell's Accounting.**

61.     Defendants knew or were deliberately reckless regarding their accounting errors, but only decided to correct the misstatements after inquiries from the SEC.

62.     On May 1, 2018, Honeywell began the formal process of spinning out Garrett, which would include the Bendix-related asbestos liabilities, by filing a draft registration statement confidentially with the SEC. According to a complaint against Honeywell subsequently filed by Garrett, Darius Adamczyk, Honeywell's CEO, was the architect of the spin-off. The agreement between Honeywell and Garret outlined in the registration statement was arranged by Honeywell's own in-house counsel, Su Ping Lu, who acted as Garrett's president and sole director during the spin-off process. There were no independent attorneys or directors

25

negotiating on behalf of Garrett.

63.    The registration statement stated "[i]n connection with the Spin-Off, we [Garrett] intend to enter into an Indemnification and Reimbursement Agreement (as defined below), pursuant to which we will have an obligation to make quarterly cash payments to Honeywell in amounts equal to 90% of Honeywell's asbestos-related liability payments, primarily related to Honeywell's legacy Bendix friction materials ("Bendix") business…subject to an annual cap of $175 million." Further, "[t]he obligation will continue until the earlier of: (1) the 30th year anniversary of the execution of the Indemnification and Reimbursement Agreement; or (2) December 31 of the third consecutive year during which the annual indemnification obligation has been less than $25 million." In other words, Honeywell estimated that it could be liable for up to $175 million annually for the following 30 years for the Bendix asbestos-related litigation. It is unclear why Honeywell made such an estimation for the purposes of an indemnity agreement but believed it could not estimate beyond a five-year time horizon for the purposes of preparing its own balance sheets.

64.    In order to demonstrate the extent of this indemnification agreement, the registration statement contained historical financial statements for the transportation business that were prepared by Honeywell using the same accounting policy for its future Bendix-related asbestos liabilities. The Garrett

26

financial statements included the same provision of $616 million as of December 31, 2017 for Bendix asbestos related liabilities.

65.    The SEC challenged this number through a series of letters and conferences with Honeywell and Garrett. Eventually Honeywell admitted that there had been an error, that its internal controls were deficient, and that "the impact of correcting the error in 2018 would be *a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts*." (emphasis added).

66.    These letters were not made public until October, 2018 due to Honeywell's request for confidential treatment. By requesting the correspondence remain confidential, Honeywell further misled its shareholders and prevented the public from timely learning vital information about its business.

*May 24, 2018 Letter from SEC to Honeywell/Garrett*

67.    On May 24, 2018, the Division of Corporation Finance at the SEC wrote to Su Ping Lu raising questions about the draft registration statement. The SEC also sent the letter to Honeywell's corporate counsel, John C. Kennedy, an attorney at Paul, Weiss, Rifkind, Wharton & Garrison LLP. Due to the aforementioned request for confidential treatment, the SEC did not release this letter to the public until October 5, 2018, more than four months after it was

written. In this letter, the SEC stated that Honeywell's accounting for Bendix asbestos related liabilities did not appear to comply with GAAP, specifically ASC 450. In particular, the SEC told Honeywell:

> ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied. ***Therefore, we do not believe there is a conceptual basis for limiting an ASC 450 assessment to a certain time horizon. We believe your ASC 450 assessment should consider all claims without limitation to a specific time period.*** It is unclear how the ASC 450 assessment was considered for periods outside of the five year time horizons.
>
> ***Based on your history with asbestos claims, it seems unlikely to us that the low end of your range of probable losses for time periods beyond five years is zero.***

(emphasis added).

### June 8, 2018 Letter from Honeywell/Garrett to SEC

68.     In their June 8, 2018 response to the SEC (which was also made public on October 5, 2018), Honeywell "acknowledge[d] that ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied." It also acknowledged that "epidemiological projections of the incidence of disease extend well beyond a five-year time horizon." Honeywell, nonetheless, pointed to potential future scientific research and legal developments as justifying its decision to not accrue the potential liability for asbestos claims after 2022. It stated:

> Honeywell selected a five-year future time horizon as the reasonable basis for valuing possible future claims as we believe that any loss or

range of loss for probable asbestos claims beyond the five-year period is not reasonably estimable.

***

*While Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period (i.e., in year six), the inherent uncertainty that has resulted from emerging scientific and medical research and from volatility of legal standards in asbestos cases and rulings that we expect to continue have made it difficult to predict asbestos claim rates, settlement values and dismissal rates or to reasonably estimate any loss amount, or range of loss, for such claims beyond a five-year period.*

(emphasis added).

69.     Honeywell proposed to include additional disclosures explaining its limit of five years for estimating future Bendix asbestos related liability and include an additional risk factor notifying investors that Honeywell "acknowledge[s] that it is probable that there will be losses associated with Bendix claims beyond the five-year horizon." Honeywell did not, however, state that it was unable to estimate asbestos related liability for periods beyond five years based on existing science and legal standards or why these potentially favorable future developments meant it was more accurate to simply record zero liability for any claims filed after the five-year horizon.

### *June 21, 2018 Letter from SEC to Honeywell/Garrett*

70.     The SEC was unimpressed by Honeywell's response and responded on June 21, 2018 asking Honeywell to advise "how and why you determined that a five- year time period to estimate losses for unasserted claims yields reliable

29

estimates but time periods beyond five years cannot be reasonably estimated." The SEC questioned Honeywell "whether [it] (1) attempted to estimate a liability for potential claims beyond the five year period but concluded the resulting estimate of loss (or range) was not reasonable or (2) did not attempt to estimate a liability beyond the five year period because [it] believed [it] could not develop a reasonable estimate." This letter was also made public on October 5, 2018.

*June 29, 2018 Letter from Honeywell/Garrett to SEC*

71.     Honeywell responded on June 29, 2018, just a few weeks before filing its Q2:18 quarterly financial report, again pointing to scientific research and its litigation strategy as making "five years a reasonable outer limit for the period of time over which claim rates and claim resolution values would remain unaffected by current scientific developments and litigation activities." In response to whether Honeywell attempted to estimate liability beyond five years, Honeywell stated that they attempted a mathematical extrapolation of the data beyond the five-year horizon and "such calculation generated an ***estimated reasonably possible exposure over the full term of the epidemiological projections for potential claims not yet asserted of $1.3 billion*** as of December 31, 2017." (emphasis added).

> Honeywell estimates its future liability for asbestos- related claims based upon three significant variables: (a) epidemiological projection of the future incidence of asbestos-related disease; (b) projected claims rates, including number, type and nature of claims filed against

Honeywell drawn from Honeywell's recent claims experience; and (c) projected average claim resolution values, by type of claim, drawn from Honeywell's recent claims experience. As described in our response to Comment 1 above, Honeywell believes that two of the three variables (specifically, (b) and (c) above) cannot be reasonably estimated beyond a five-year period. Notwithstanding this limitation, Honeywell applied variables (b) and (c) to the epidemiological projections in the manner used by Honeywell to calculate estimated losses during the five-year forecasting period spanning 2018-2022. Based on this mathematical extrapolation, such calculation generated ***an estimated reasonably possible exposure over the full term of the epidemiological projections for potential claims not yet asserted of $1.3 billion as of December 31, 2017***.

(emphasis added).

72.     This letter was not made public until October 5, 2018 due to a request for confidential treatment.

73.     Despite knowing that it had potential exposure to Bendix asbestos related liability of $1.3 billion and that the SEC believed that its prior accounting for this liability did not comply with GAAP, Honeywell filed its quarterly report on July 20, 2018 using its historical accounting methodology and still stating that its future Bendix asbestos liability was $610 million. Honeywell stated that its financial statements were prepared in accordance with GAAP. Honeywell did not disclose that the SEC did not believe there was a conceptual basis under GAAP for Honeywell's accounting methodology and did not include any of the additional cautionary language that it had proposed to the SEC in its letter dated June 8, 2018. The July 2018 Quarterly Report was also accompanied by SOX certifications

signed by CEO Adamczyk and CFO Szlosek certifying that the financial statements were properly stated and disclosed all material weaknesses and significant deficiencies.

### *July 27, 2018 Letter from SEC to Honeywell/Garrett*

74.     On July 25, 2018, representatives of Honeywell and Garrett had a telephone conference with the SEC who followed up with a letter dated July 27, 2018, which was also made public on October 5, 2018. In that letter, the SEC asked once again, and with a more forceful tone than previously, for support for Honeywell's historical accounting for Bendix asbestos related liability.

75.     The SEC did not accept Honeywell's position that the legal and scientific environment made estimates past five years unreliable. The SEC pointed out to Honeywell "[b]ased on your disclosures it appears that ***over the last 10 years you have had relatively consistent amounts*** of Bendix liabilities accruals and payouts." (emphasis added). Additionally, the SEC noted that according to Honeywell, "a reasonably possible exposure over the full term of the epidemiological projections for Bendix IBNR claims would be $1.3 billion." Therefore, the SEC understood "that this would represent $820 million of reasonably possible additional exposure beyond what is recorded at December 31, 2017, extending over an approximate 30 year period beginning in 2023."

### *August 8, 2018 Letter from Honeywell/Garrett to SEC*

76.     On August 8, 2018, Honeywell finally agreed with the SEC that its historical accounting for Bendix asbestos liability was inappropriate and not in accordance with GAAP. Honeywell admitted, it "has determined that *it had not appropriately applied the provisions of ASC 450* when measuring its asbestos liabilities related to unasserted Bendix claims." (emphasis added). As a result of this material error, Garrett restated its historical financial statements. The effect of the restatement was to increase asbestos related liabilities by approximately $1.1 billion.

77.     Honeywell also advised the SEC that "a *material weakness in internal control* over financial reporting was identified related to a deficiency of internal control for the estimation of probable and reasonably estimable liability for unasserted Bendix-related asbestos claims." (emphasis added). Honeywell told the SEC that it would also be "revising" its historical financial statements to correct this error, although it did not act on this promise until after receiving yet another questioning letter from the SEC. In acknowledging the error in its historical financial statements, Honeywell "concluded that the appropriate application of ASC 450 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in its measurement of such liability." This was because there was no "objective and verifiable data" to support limiting the estimate to just a five-year period.

78.     The same day, August 8, 2018, Garrett filed Amendment No. 2 to its

Confidential Draft Form 10 with the SEC restating its financials. In "Note 1.

Restatement of Combined Financial Statements" Garrett stated the following:

> In August 2018, the Transportation Systems business ("TS," the "Business," the "Company," "we" or "our") of Honeywell International Inc. ("Honeywell" or the "Parent") determined that *it had not appropriately applied the provisions of ASC 450, Contingencies, in measuring its asbestos liabilities related to unasserted Bendix claims* (see Note 18 Commitments and Contingencies). The Company now reflects the full term of the epidemiological projections rather than a five-year time horizon when estimating the liability for unasserted Bendix-related asbestos claims.
>
> *In light of the foregoing, the Company has restated the financial statements as of and for the years ended December 31, 2017, 2016, and 2015 to reflect the effects of its revised method for estimating its total liability for unasserted Bendix-related asbestos claims and to make certain corresponding disclosures related thereto.*

(emphasis added).

79.     Additionally, Garrett disclosed:

> Our financial statements are derived from the consolidated financial statements and accounting records of Honeywell. In the course of preparing for our Spin-Off from Honeywell, *Honeywell reassessed its accounting for unasserted Bendix-related asbestos claims to reflect the full term of the epidemiological projections in its measurement of such liability.*
>
> ***
>
> Specifically, after assessing the deficiency that allowed the error to occur, and after assessing the materiality of the error to the Company's Combined Financial Statements, it was determined that *<u>there were not effective controls in place</u>* to provide reasonable assurance that a material error would be prevented or detected related to the application of ASC 450 (Contingencies) in the estimation of such Bendix-related asbestos liability.

(emphasis added).

80.     Additionally, on September 5, 2018, Garrett filed Amendment No. 1 to the final Form 10 with the SEC relating to its registration of securities. The report of the independent registered public accounting firm notes that "the accompanying financial statements have been restated to correct a misstatement." Garrett elaborated that it had "restated the financial statements as of and for the years ended December 31, 2017, 2016, and 2015 to reflect the effects of its revised method for estimating its total liability for unasserted Bendix-related asbestos claims and to make certain corresponding disclosures related thereto."

81.     Thus, while Honeywell eventually restated its financials solely for the year ended December 31, 2017, Garrett restated its financials for 2017, 2016, and 2015 based on the same facts.

### *August 14, 2018 Letter from SEC to Honeywell*

82.     On August 14, 2018, the SEC sent a letter to Honeywell regarding its review of Honeywell's Form 10-K for the Fiscal Year ending December 31, 2018. The SEC made this letter public on October 10, 2018. Once again, the SEC questioned Honeywell's accounting for its asbestos related liabilities, stating:

> We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO- related asbestos

liability. In your response, also ***please provide us with an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods***.

(emphasis added).

*August 20, 2018 Letter from Honeywell to SEC*

83.   On August 20, 2018, Honeywell responded to the SEC via letter, revealing the full extent of their accounting scheme to mask the true extent of their asbestos liabilities. The SEC made this letter available to the public on October 10, 2018. Honeywell admitted that its accounting for Bendix related asbestos liability was incorrect, and that it would need to issue a restatement. This was a material adjustment – Honeywell stated "the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts."

84.   Honeywell further stated:

Upon thorough consideration of the Staff's comments in its review of the Form 10 submitted to the Staff in connection with the proposed spin- off of Garrett Motion Inc. and of the application of ASC 450, Honeywell determined that ***we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims***. Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect ***the full term of the epidemiological projections in the measurement of such liability***. The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of

36

liability for unasserted Bendix-related asbestos claims."

(emphasis added).

85.     Honeywell did not follow Garrett's decision to revise its financial statements for the years ending December 31, 2016 and December 31, 2015, stating "the effects of the error on the misstated income statements, statements of cash flows and balance sheets of those prior periods is less than 5% of all key metrics in each period." However, Honeywell did recognize a "quantitatively material" change in net income (-6.5%) and comprehensive income (-5.0%) for the year ended December 31, 2017, primarily due to "an increase in the Company's tax provision as a result of US Tax Reform enacted in December 2017." Honeywell stated that while the error did not affect any of its key balance sheet metrics, including equity, by more than 4.5%, the effects of a "cumulative correction" on the 2018 income statement would be material. "For instance, ***the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts***." (emphasis added). Honeywell concluded that it was necessary to revise all its prior financial statements beginning with the December 31, 2017 10-K.

86.     Under Section 2 – Sox 404 Internal Control Assessment, Honeywell stated:

As indicated previously, in August 2018, management concluded it should adjust the Bendix asbestos liability to reflect the *full term of the epidemiological projections through 2059*, and therefore, determined that it had *historically incorrectly applied the provisions of ASC 450, Contingencies, in measuring its Bendix asbestos liability related to unasserted claims*. This error, and the related control deficiency, were identified during the course of the SEC Staff's review of the Form 10 filing related to Garrett Motion Inc.

***

The error that was identified is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted…This key control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix-related asbestos reserves are adjusted to properly reflect current year estimates regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. *Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims.* Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

This control focuses on the analysis and validation of the Bendix asbestos unasserted claims liability. Rights and obligation and valuation and allocation assertions are the relevant assertions that the control addresses.

***

[I]n connection with the performance of this control, the Company

38

***inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon.*** The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence.

(emphasis added).

87.    As a result, Honeywell "concluded it was appropriate to revise prior periods when correcting the error under SAB 99." Honeywell also admitted "[t]his consideration implies that there was information available that should have caused us to modify the time horizon used for the Bendix unasserted claims liability at an earlier point." Honeywell did not explain why, given the availability of the information at an earlier point, management chose not to modify the five-year time horizon.

88.    On August 23, 2018 Honeywell announced to the public that the SEC's comments that were given to Garrett "are also applicable to Honeywell's historical financial statements." Honeywell announced that it corrected its accounting related to the time horizon for estimating future Bendix asbestos liabilities following a review by the SEC's Division of Corporation Finance. Attached to the August 23, 2018 Form 8-K as Exhibit 99, Honeywell attached restated financial statements indicating **an additional $1.083 billion in asbestos-**

**related liabilities**.

89.     On September 11, 2018 the SEC Division of Corporation Finance informed Honeywell by letter that it had completed its review of the Company's Form 10-K for the fiscal year ending December 31, 2017. The SEC released this letter on October 10, 2019, along with other correspondence Honeywell had requested remain confidential.

90.     On October 19, 2018 in the Q3:18 10-Q, Honeywell disclosed that the SEC's Division of Corporation Finance had reviewed Honeywell's prior accounting for liability for unasserted Bendix-related asbestos claims and that "[o]n September 13, 2018, following completion of Corporation Finance's review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter."

**E.     Honeywell's Control Deficiency.**

91.     A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.

92.     Honeywell determined that it should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450, *Contingencies*, in measuring its Bendix asbestos liability related to

unasserted claims.

93.     Honeywell stated that this error "is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted."

94.     Honeywell used a third-party specialist to assist in assessing the required Bendix unasserted claims liability. In connection with the third-party specialist, Honeywell had designed a relevant internal control over that process that focused on the analysis and validation of the Bendix asbestos unasserted claims liability.

95.     The specific control activity was the "Bendix Reserves True-up" control, which provided that "Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management."

96.     This control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix- related asbestos reserves were adjusted to properly reflect current year estimates regarding both resolution values and estimated future

41

claimants based on anticipated changes in the population of claims.

97.     Management (including Adamczyk and Szlosek) was highly involved in this internal control and had direct impact on the accounting of Bendix's asbestos liability. Management reviewed the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discussed with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos-related claims was also included in those discussions.

98.     Management had historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims. Management approved any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

99.     Honeywell also had conversations among management, its third-party specialists and outside counsel about what appeared to be a movement of companies to extend out the time horizon.

100.    In its July 27, 2018 letter, the SEC, suspecting a controls deficiency, asked several pointed questions about this third-party specialist:

1.     What was the external actuary specifically asked to do with regards to the period over which claims were reasonably estimable? Did the Company ask the actuary to confirm its view that five years was the period over which Bendix claims

42

were reasonably estimable, or was the actuary requested to provide its independently determined view on what time period would be reasonably estimable?

2.    You asserted that you believe that the same actuary has performed services relating to the Bendix accrual since 2006. During that time period, have there been any significant changes in what the actuary has been requested to do by the Company? Were there any changes that have occurred during the last three years (2015-2017)?

Honeywell never directly answered these questions.

101.   In its August 20, 2018 letter to the SEC Honeywell admitted that it had identified an operating effectiveness deficiency related to this internal control activity.

102.   As part of the operation of the identified deficient Bendix control, a review of the conclusion on the unasserted claims liability occurred in connection with the data analysis and specialist report.

103.   Honeywell found that in connection with the performance of this control, it inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon.

104.   Honeywell under-reported its liability based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon.

105.   Additionally, by its own admission, Honeywell "did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might

43

have been more appropriate than a five-year time horizon based on that evidence." Honeywell concluded that this failure to consider evidence beyond the five-year horizon was a deficiency in its internal controls.

**F.     Management's Responsibility for Financial Reporting.**

106.   Defendants represented in each of Honeywell's periodic reports filed with the SEC on Forms 10-K and 10-Q that the financial statements therein conformed with GAAP.

107.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). Effective July 1, 2009, the FASB issued the FASB ASC which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. The ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC 105-10-5-1).

108.   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP

are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)).

109.   Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by the American Institute of Certified Public Accounts states in pertinent part:

> ***The financial statements are management's responsibility***. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***.

> (1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982)).

> (emphasis added).

110.   Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls. "Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall-…devise and

maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements…." (15 U.S.C. § 77m(b)(2)(B)(ii)(I)).

111.   Honeywell's management, including its CEO and CFO, conducted evaluations of the effectiveness of Honeywell's internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory requirements. Inherent in the fair presentation of financial statements is the concept of statement materiality. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

112.   An error in previously issued financial statements is an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared." A "retrospective application" is the "application of a different accounting principle to one or more previously issued financial statements." A "restatement" is the "process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC 205-10-20).

113.   Upon the discovery of a material error in a previously issued financial statement:

> [The] error . . . shall be reported as an error correction[] by restating the prior-period financial statements. Restatement requires all of the following:
>
>> a. The cumulative effect on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented[;]
>> b. An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period[;] [and]
>> c. Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

(ASC 250-10-45-23).

114.   When restating financial statements for the purpose of correcting an error:

[T]he entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose both of the following:

> a. The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented
> b. The cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position as of the beginning of the earliest period presented.

(ASC 250-10-50-7).

115.   Other circumstances requiring the revision of financial statements, neither of which are applicable here, include a change in the reporting entity or a change in an accounting principle. (ASC 250-10-45).

116.   Restating financial statements dilute public confidence in the companies to which they belong. Further, restatements confuse those who use them. Consequently, financial statements prepared in accordance with GAAP should be considered final, and only restated for the purpose of correcting material errors. (ASC 105-10-5-6).

117.   As a result of Honeywell's improper accounting Honeywell concluded it had a "significant deficiency" in internal controls over financial reporting and that it would need to restate prior periods. Specifically, Honeywell found that the effects of a cumulative correction on Honeywell's projected 2018 income statement, would be material. Honeywell determined that the impact of correcting

the error in 2018 would be **a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income**. This would represent a greater than 10% impact on both of the forecasted 2018 amounts.

118.   Honeywell calculated the cumulative effect of the uncorrected error on the balance sheets and determined that the error would have a -6.5% effect on net income and a -5% on comprehensive income for the year ended December 31, 2017.

119.   Accordingly, Honeywell concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods.

120.   Honeywell also determined that it was appropriate to revise prior periods when correcting the error under SAB 99. Honeywell admits that this consideration implies that there was information available that should have caused Honeywell to modify the time horizon used for the Bendix unasserted claims liability during those prior periods.

121.   Honeywell restated its accounting for asbestos liability claims in the third quarter of 2018 in relation to the SEC's corporation finance division review of the Company's annual report for 2017. That report included Honeywell's accounting for legacy asbestos claims from its former Bendix business

122.   Honeywell's revised accounting for asbestos-related liabilities, as of

December 31, 2017, projects out to 2059 and is $2.61 billion, $1.087 billion higher than Honeywell's prior estimate, solely due to an increase in Bendix liability.

123.   Additionally, Honeywell's insurance recoveries for asbestos-related liabilities were raised to $503 million, as of December 31, 2017, $68 million higher than its previous estimate.

## G.   Honeywell's Competitors Accounted for the Full-Term Asbestos Related Liabilities.

124.   Honeywell's decision to use a five-year horizon was also at odds with and contrary to industry practices, as evidenced by the accounting practices of other companies with asbestos-related litigation exposure. Indeed, as stated in the appendix to Honeywell's August 20, 2018 response to the SEC:

> [The] conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), [and] (ii) noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity) . . . . The Company also had conversations between management [Adamczyk and Szlosek], its third-party specialists and outside counsel about what appeared to be a movement of companies to extend out the time horizon.

125.   Honeywell even admits that adjusting the time horizon of the Bendix liability "would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers."

126.   In The Dow Chemical Company's Form 10-K for the year ending

December 31, 2016, The Dow Chemical Company's subsidiary, Union Carbide, "increased its December 31, 2002 asbestos-related liability for pending and future claims for a 15-year period ending in 2017 to $2.2 billion, excluding future defense and processing costs." Union Carbide studied "both a 15-year period and through the terminal year of 2049." Union Carbide "determined that using the estimate through the terminal year of 2049 was more appropriate due to increasing knowledge and data about the costs to resolve claims and diminished volatility in filing rates."

127.   Similarly, in a Form 8-K filed with the SEC on April 28, 2016, Owens-Illinois, Inc. revised its accounting for asbestos related liability from four years out until an indefinite period of time into the future. Owens-Illinois, Inc. noted, "Beginning in 2003, the Company has estimated its asbestos-related liability based on an annual analysis of how far in the future it could reasonably estimate the number of claims it expected to receive. Subsequent to the filing of its 2015 Annual Report, the Company was informed by the SEC staff that they believe that, under the applicable accounting pronouncement, the Company should consider all claims without limitation to a specific time period. In light of these discussions, the Company has concluded, in consultation with the Audit Committee and the Company's independent registered public accounting firm Ernst & Young LLP ("EY"), that its method for estimating its future asbestos-related liability was not

51

consistent with the applicable accounting pronouncement. With the assistance of an external consultant, and utilizing a model with actuarial inputs, the Company has developed a new method for reasonably estimating its total asbestos- related liability. Using the new model, the Company's total asbestos-related liability, without limitation to a specific time period, is expected to be $806 million as of March 31, 2016. This is $295 million higher than the estimation method used previously that used a four-year future period."

128.   In 2016, Crown Holdings, Inc. changed its accounting for asbestos related liabilities. Previously, Crown Holdings, Inc. "estimated probable costs for claims through the year 2025." However, beginning in Crown Holdings, Inc. Form 10-K for year-end 2016, Crown Holdings began accounting for asbestos-related liabilities "without limitation to a specified time period."

129.   In 2007, Ingersoll-Rand changed its accounting under ASC 450 for asbestos-related liabilities from seven years into the future out until 2053, "the period over which the Company has and is likely to resolve asbestos-related claims against it in the future." Ingersoll-Rand notes:

> In the fourth quarter of 2007, the Company again reviewed its history and experience with asbestos-related litigation and determined that *it had now become possible to make a reasonable estimate of its total liability for pending and unasserted potential future asbestos-related claims*. This determination was based upon the Company's analysis of developments in asbestos litigation, including the substantial and continuing decline in the filing of non-malignancy claims against the Company, the establishment in many jurisdictions of inactive or

deferral dockets for such claims, the decreased value of non-malignancy claims because of changes in the legal and judicial treatment of such claims, increasing focus of the asbestos litigation upon malignancy claims, primarily those involving mesothelioma, a cancer with a known historical and predictable future annual incidence rate, and the Company's substantial accumulated experience with respect to the resolution of malignancy claims, particularly mesothelioma claims, filed against it.

(emphasis added).

130.   Since 2007, the 3M Company, one of it not the biggest competitor of Honeywell, has projected its asbestos-related liability out based on the amount of future projected claims for an indefinite period of time into the future. The 3M Company explains that it:

[E]stimates its respirator mask/asbestos liabilities, including the cost to resolve the claims and defense costs, by examining: (i) the Company's experience in resolving claims, (ii) apparent trends, (iii) the apparent quality of claims (e.g., whether the claim has been asserted on behalf of asymptomatic claimants), (iv) changes in the nature and mix of claims (e.g., the proportion of claims asserting usage of the Company's mask or respirator products and alleging exposure to each of asbestos, silica, coal or other occupational dusts, and claims pleading use of asbestos-containing products allegedly manufactured by the Company), (v) *the number of current claims and a projection of the number of future asbestos and other claims that may be filed against the Company*, (vi) the cost to resolve recently settled claims, and (vii) an estimate of the cost to resolve and defend against current and future claims.

(emphasis added).

## H.    Defendants Made Materially False and Misleading Statements.

131.   Throughout the Class Period, Defendants made materially false and

53

misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Honeywell's Bendix-related asbestos liabilities was greater than initially reported; (ii) Honeywell maintained improper accounting practices and controls over financial reporting and public disclosures in connection with its Bendix-related asbestos liabilities; and (iii) as a result, Honeywell's public statements were materially false and misleading at all relevant times. Additionally, Honeywell failed to disclose that the SEC began questioning its accounting practices with regard to the Bendix-related asbestos liabilities in May, 2018. Due to these materiality misleading statements and omissions, the price of Honeywell's stock was artificially inflated.

### *February 9, 2018 Form 10-K*

132.   On February 9, 2018, the start of the Class Period, Honeywell filed an annual report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2017. Adamczyk and Szlosek signed the 2017 10-K on behalf of Honeywell.

133.   The 2017 10-K contained a series of "Notes" to its consolidated financial statements. Note 19, titled "Commitments and Contingencies," discussed the Company's asbestos-related liabilities. In Note 19, Honeywell provided a chart showing that its total Bendix-related asbestos liabilities were as of December 31,

2017 was $616 million:

**Asbestos Related Liabilities**

|  | Year Ended December 31, 2017 | | | Year Ended December 31, 2016 | | | Year Ended December 31, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Bendix | NARCO | Total | Bendix | NARCO | Total | Bendix | NARCO | Total |
| Beginning of year | $ 641 | $919 | $1,560 | $ 622 | $921 | $1,543 | $ 623 | $929 | $1,552 |
| Accrual for update to estimated liability | 199 | 31 | 230 | 203 | 9 | 212 | 180 | 8 | 188 |
| Change in estimated cost of future claims | (4) | — | (4) | 13 | — | 13 | 11 | — | 11 |
| Update of expected resolution values for pending claims | 3 | — | 3 | 4 | — | 4 | 1 | — | 1 |
| Asbestos related liability payments | (223) | (43) | (266) | (201) | (11) | (212) | (193) | (16) | (209) |
| End of year | $ 616 | $907 | $1,523 | $ 641 | $919 | $1,560 | $ 622 | $921 | $1,543 |

This representation was false and materially misleading because Honeywell's true Bendix-related asbestos liabilities as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.

134. The representation was also materially false and/or misleading because it stated that Honeywell was complying with generally accepted accounting principles and various accounting standards, namely ASC 450, in calculating this figure. It was not. Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms. Instead of estimating its Bendix-related asbestos liabilities to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward. There was no conceptual basis for limiting this ASC 450 assessment. Honeywell provided its $616 million estimate without any warning that the estimate was unsupported by, contrary to, and in

violation of applicable accounting standards. This was not a matter of opinion, but instead a direct and intentional violation of generally accepted accounting principles.

135.   In Note 19, Honeywell also provided investors with a description of its method for determining the Company's Bendix-related asbestos liabilities. In pertinent part, the 2017 Form 10-K stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. ***In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.*** The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

(emphasis added).

136.   This statement was materially false and misleading. Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally decided not to do so. Honeywell's decision to restate its asbestos

liability estimates on August 23, 2018, proves this point and confirms the Company had the information necessary to provide the correct financial information throughout the Class Period. Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors the Company did not have the ability to estimate Bendix- related liabilities for a period greater than five years in the future.

137.   The 2017 10-K also indicates that Honeywell had net income of $1.655 billion attributed to Honeywell and comprehensive income of $2.177 billion. However, unbeknownst to investors this number was false and misleading as Honeywell had actually inflated its net income by 6.5% and comprehensive income by 5% by limiting asbestos liability to just five years. In other words, had Honeywell properly accounted for its $1.703 billion of Bendix-related asbestos liabilities, the Company's net income and comprehensive income would have been decreased by 6.5% and 5%, respectively.

138.   In connection with Honeywell's 2017 10-K, Adamczyk and Szlosek each certified pursuant to the Sarbanes-Oxley Act of 2002 that they reviewed the 2017 10-K. Specifically, Adamczyk and Szlosek each certified that:

1.   I have reviewed this Annual Report on Form 10-K of Honeywell International Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b)      ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

(emphasis added).

139.    Adamczyk's and Szlosek's certifications were materially false and/or misleading for three reasons. First, the certifications falsely represented that the financial statements within the 2017 10-K "fairly present[ed] in all material respects the financial condition…of the registrant as of, and for, the periods presented in this report." This was not true. As discussed above, Honeywell's true Bendix-related asbestos liabilities as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.

140.    Second, the certifications falsely represented that Honeywell's internal controls over financial reporting were designed to ensure the Company's financial statements within the 2017 10-K were in conformance with generally

accepted accounting principles. This was not true. As discussed above, Honeywell and its senior management (including Adamczyk and Szlosek) had implemented and maintained an internal control that allowed the Company to inappropriately rely on limited objective and verifiable data in order to use a five-year horizon when estimating Bendix-related asbestos liabilities. In turn, the control allowed Honeywell to under-report its liability based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. This was not in conformance with GAAP. Accordingly, Honeywell's internal controls over financial reporting were not designed to ensure compliance with generally accepted accounting principles.

141.  Third, although Adamczyk and Szlosek represented in their certifications that they had disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, they in fact had not. As discussed above, Adamczyk and Szlosek were responsible for the implementation and maintenance of an internal control that violated generally accepted accounting principles and, in turn, allowed Honeywell to materially under- report its Bendix-related asbestos liabilities. Adamczyk and Szlosek had not disclosed this significant deficiency and/or material weakness and, as a result, their certifications were materially false and misleading.

142.  The omissions and/or misrepresentations in the 2017 10-K and the

accompanying certifications were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

### *April 20, 2018 Form 10-Q*

143.   On April 20, 2018, Honeywell filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the first quarter of 2018 (the "Q1:18 10-Q"). Jennifer H. Mak signed the Q1:18 10-Q on behalf of Honeywell.

144.   The Q1:18 10-Q contained a series of "Notes" to its consolidated financial statements. Note 14, titled "Commitments and Contingencies," discussed the Company's asbestos-related liabilities. In a table under Note 14, Honeywell represented that its total Bendix-related asbestos liabilities were $616 million as of December 31, 2017 and $615 million as of March 31, 2018:

**Asbestos Related Liabilities**

|  | Bendix | NARCO | Total |
|---|---|---|---|
| December 31, 2017 | $    616 | $    907 | $    1,523 |
| Accrual for update to estimated liability | 47 | 8 | 55 |
| Asbestos related liability payments | (48) | (2) | (50) |
| March 31, 2018 | $    615 | $    913 | $    1,528 |

This representation was false and materially misleading because Honeywell's true Bendix-related asbestos liabilities as of December 31, 2017 were actually $1.703 billion, nearly three times more than the amount represented.

145.   The representation was also materially false and/or misleading

because it stated that Honeywell was complying with generally accepted accounting principles and various accounting standards, namely ASC 450, in calculating this figure. It was not. Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms. Instead of estimating its Bendix-related asbestos liabilities to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward. There was no conceptual basis for limiting this ASC 450 assessment. Honeywell provided its Bendix-related asbestos liabilities estimate without any warning that the estimate was unsupported by, contrary to, and in violation of applicable accounting standards. This was not a matter of opinion, but instead a direct and intentional violation of generally accepted accounting principles.

146.   In Note 14, Honeywell also provided investors with a description of its method for determining the Company's Bendix-related asbestos liabilities. In pertinent part, the Q1:18 10-Q stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future

asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. *In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.* The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

(emphasis added).

147. This statement was materially false and/or misleading. Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally chose not to do so. Honeywell's decision to restate its asbestos liability estimates on August 23, 2018 proves this point and confirms the Company had the information necessary to provide the correct financial information throughout the Class Period. Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors the Company did not have the ability to estimate Bendix-related liabilities for a period greater than five years in the future.

148. In connection with Honeywell's Q1:18 10-Q, Defendants Adamczyk and Szlosek each certified pursuant to SOX that they reviewed the Q1:18 10-Q. Specifically, Adamczyk and Szlosek each certified that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Honeywell International Inc.;

2.   *Based on my knowledge, this report does not contain any*

*untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) *designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period

covered by this report based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b)      ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

(emphasis added).

149.    Adamczyk's and Szlosek's certifications were materially false and/or misleading for three reasons. <u>First</u>, the certifications falsely represented that the financial statements within the Q1:18 10-Q "fairly present[ed] in all material respects the financial condition . . . of the registrant as of, and for, the periods presented in this report." This was not true. As discussed above, Honeywell's true

Bendix-related asbestos liabilities were $1.703 billion as of December 31, 2017, nearly three times more than the amount represented.

150. Second, the certifications falsely represented that Honeywell's internal controls over financial reporting were designed to ensure the Company's financial statements within the Q1:18 10-Q were in conformance with generally accepted accounting principles. This was not true. As discussed above, Honeywell and its senior management (including Adamczyk and Szlosek) had implemented and maintained an internal control that allowed the Company to inappropriately rely on limited objective and verifiable data in order to use a five-year horizon when estimating Bendix-related asbestos liabilities. In turn, the control allowed Honeywell to under-report its liability based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. This was not in conformance with generally accepted accounting principles. Accordingly, Honeywell's internal controls over financial reporting were not designed to ensure compliance with generally accepted accounting principles.

151. Third, although Adamczyk and Szlosek represented in their certifications that they had disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, they in fact had not. As discussed above, Adamczyk and Szlosek were responsible for the implementation and maintenance of an internal control that violated

generally accepted accounting principles and, in turn, allowed Honeywell to materially under- report its Bendix-related asbestos liabilities. Adamczyk and Szlosek had not disclosed this significant deficiency and/or material weakness and, as a result, their certifications were materially false and misleading.

152.   The omissions and/or misrepresentations in the Q1:18 10-Q and the accompanying certifications were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

### *July 20, 2018 Form 10-Q*

153.   On July 20, 2018, Honeywell filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the second quarter of 2018 (the "Q2:18 10-Q"). John Tus signed the Q2:18 10-Q on behalf of Honeywell.

154.   The Q2:18 10-Q contained a series of "Notes" to its consolidated financial statements. Note 15, titled "Commitments and Contingencies," discussed the Company's asbestos-related liabilities. Within Note 15, Honeywell represented that its total Bendix-related asbestos liabilities were $616 million as of December 31, 2017 and $610 million as of June 30, 2018.

**Asbestos Related Liabilities**

|  | Bendix | | NARCO | | Total | |
|---|---|---|---|---|---|---|
| December 31, 2017 | $ | 616 | $ | 907 | $ | 1,523 |
| Accrual for update to estimated liability |  | 92 |  | 19 |  | 111 |
| Asbestos related liability payments |  | (98) |  | (8) |  | (106) |
| June 30, 2018 | $ | 610 | $ | 918 | $ | 1,528 |

This representation was materially false and/or misleading because Honeywell's true Bendix-related asbestos liabilities were $1.703 billion as of December 31, 2017, nearly three times more than the amount represented.

155.   The representation was also materially false and misleading because it stated that Honeywell was complying with generally accepted accounting principles and various accounting standards, namely ASC 450, in calculating this figure. It was not. Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms. Instead of estimating its Bendix-related asbestos liabilities to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward. There was no conceptual basis for limiting this ASC 450 assessment. Honeywell provided its Bendix-related asbestos liabilities estimate without any warning that the estimate was unsupported by, contrary to, and in violation of applicable accounting standards. This was not a matter of opinion, but instead a direct and intentional violation of generally accepted accounting principles.

156.   In Note 15, Honeywell also provided investors with a description of its method for determining the Company's Bendix-related asbestos liabilities. In pertinent part, the Q2:18 10-Q stated:

Our consolidated financial statements reflect an estimated liability for

resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.

The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. ***In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.*** The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

(emphasis added).

157.    This statement was materially false and misleading. Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally decided not to do so. Honeywell's decision to restate its asbestos liability estimates on August 23, 2018, proves this point and confirms the Company had the information necessary to provide the correct financial information throughout the Class Period. Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors the Company did not have the ability to estimate Bendix- related liabilities for a period greater than five years in the future.

158.    Finally, the Q2:18 10-Q was materially false and/or misleading

because it omitted and/or concealed that Honeywell had received correspondence from the SEC's Division of Corporation Finance requiring the Company to explain or restate its Bendix-related asbestos liabilities and/or that the SEC was contemplating an investigation or legal proceeding.

159.    Pursuant to Item 103 of Regulation S-K (17 CFR § 229.103), Honeywell was required to describe "material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which [it] or any of its subsidiaries [was] a party or of which any of their property is the subject." Item 103 requires disclosure of "the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought." Item 303 also requires companies to "[i]nclude similar information as to any such proceedings known to be contemplated by governmental authorities."

160.    The correspondence by and between Honeywell and the SEC prior to the Q2:18 10-Q demonstrates that the SEC was contemplating a proceeding against Honeywell. Therefore, pursuant to Item 103 and because of the materiality of the information required to be disclosed under Item 103, Honeywell's Q2:18 10-Q was materially misleading.

161.    In connection with Honeywell's Q2:18 10-Q, Defendants Adamczyk and Szlosek each certified pursuant to SOX that they reviewed the Q2:18 10-Q.

Specifically, Adamczyk and Szlosek each certified that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Honeywell International Inc.;

**2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3.   **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;**

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   **designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;**

   c)   evaluated the effectiveness of the registrant's disclosure

controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b)   *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

(emphasis added).

162.   Adamczyk's and Szlosek's certifications were materially false and/or misleading for three reasons. <u>First</u>, the certifications falsely represented that the financial statements within the Q2:18 10-Q "fairly present[ed] in all material respects the financial condition…of the registrant as of, and for, the periods

presented in this report." This was not true. As discussed above, Honeywell's true Bendix-related asbestos liabilities were $1.703 billion as of December 31, 2017, nearly three times more than the amount represented.

163. Second, the certifications falsely represented that Honeywell's internal controls over financial reporting were designed to ensure the Company's financial statements within the Q2:18 10-Q were in conformance with generally accepted accounting principles. This was not true. As discussed above, Honeywell and its senior management (including Adamczyk and Szlosek) had implemented and maintained an internal control that allowed the Company to inappropriately rely on limited objective and verifiable data in order to use a five-year horizon when estimating Bendix-related asbestos liabilities. In turn, the control allowed Honeywell to under-report its liability based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. This was not in conformance with GAAP. Accordingly, Honeywell's internal controls over financial reporting were not designed to ensure compliance with generally accepted accounting principles.

164. Third, although Adamczyk and Szlosek represented in their certifications that they had disclosed all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, they in fact had not. As discussed above, Adamczyk and Szlosek were responsible

for the implementation and maintenance of an internal control that violated generally accepted accounting principles and, in turn, allowed Honeywell to materially under-report its Bendix-related asbestos liabilities. Indeed, by the date of the Q2:18 10-Q, the SEC had already told Honeywell that its accounting for Bendix-related asbestos liabilities did not comply with GAAP and, in particular, ASC 450. In pertinent part, the SEC wrote "*we do not believe there is a conceptual basis for limiting an ASC 450 assessment to a certain time horizon. We believe your ASC 450 assessment should consider all claims without limitation to a specific time period.*" (emphasis added). Adamczyk and Szlosek had not disclosed this significant deficiency and/or material weakness and, as a result, their certifications were materially false and misleading.

165.   The omissions and/or misrepresentations in the Q2:18 10-Q and the accompanying certifications were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

### *July 20, 2018 Investor Call*

166.   On July 20, 2018 Honeywell held a conference call with investors to discuss its second quarter 2018 earnings. Adamczyk, Szlosek, and Lewis all spoke during this call.

167.   During his presentation, Lewis stated:

> [F]or both spins, we have filed the draft Form 10s with the SEC and
> are working through the comment letter process for each. We have
> completed rating agency presentations and are preparing for the debt
> and equity roadshows for both companies. In short, we are on track
> for the completions of both spins in 2018, and ***both businesses are
> performing well***, as you saw, and we look forward to updating you as
> the spin dates become clearer.

When asked about the timing on the spin-offs during the question and answer

portion of the call, Lewis replied:

> We are going according to plan. I think we talked about the end of the
> third quarter for turbo, and that is well aligned with our current
> thinking. Homes is also coming right behind it. We're very much in
> the throes of the preparations there as well, so nothing different. I
> think we feel pretty good about the things that we can control. ***And
> obviously, with the SEC process, that one is a bit out of our hands,
> but it's going well***.

> (emphasis added).

168.   These statements by Lewis were materially false and/or misleading. In

fact, the SEC process was not "going well." In a series of preceding letters, the

SEC had questioned Honeywell's use of a five-year time horizon for its Bendix-

related asbestos liabilities. Just a few weeks earlier, Honeywell had admitted to the

SEC it was possible to extrapolate the liability for a period longer than five years

and that a more accurate estimate of the liability was $1.3 billion. The SEC had

requested a conference with Honeywell and Garrett to discuss this new

development. It was becoming increasingly apparent that Honeywell would need to

change its accounting policy and revise its previous financial statements before the

SEC would approve the Garrett spin-off. As Honeywell had requested confidential treatment of their correspondence with the SEC, the public was not yet aware of these facts.

169. Further, when Lewis stated "both businesses are going well," he omitted to disclose that the opening balance sheet for Garrett would reflect a much higher figure for the Bendix-related asbestos liabilities than previously disclosed. This increase in liability would prevent the new business from ever doing "well." By failing to disclose the true amount of the Bendix-related asbestos liabilities, Lewis misled the public about the state of the Garrett spin-off. As Honeywell investors knew they would receive a number of Garrett shares for each share of Honeywell stock they owned when the spin-off was completed, news about Garrett was material to Honeywell investors.

170. The omissions and/or misrepresentations in the July 20, 2018 investor call were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

**I.      The Truth Emerges Through Partial Corrective Disclosures.**

### *August 23, 2018 Form 8-K*

171. On the morning of August 23, 2018, Honeywell filed an Item 7.01 disclosure on Form 8-K with the SEC revealing that it had revised its method for estimating its liability for unasserted Bendix-related asbestos claims by considering

the epidemiological projections through 2059 instead of the previous five-year time horizon.

172.   The August 23, 2018 Form 8-K states in pertinent part:

During the course of the Securities and Exchange Commission (SEC) review of the Form 10 filing for the planned spin-off of its Transportation Systems business, Garrett Motion Inc. ("Garrett"), Honeywell International Inc. ("Honeywell", the "Company" or "We") has been engaged in discussions with the staff of the SEC (the "Staff") regarding Garrett's accounting for its liability for unasserted Bendix-related asbestos claims and, in conjunction therewith, reviewed the accounting treatment of its legacy Bendix asbestos liabilities. The Staff's comments related to Garrett's accounting in this area are also applicable to Honeywell's historical financial statements.

Following these discussions, *the Company revised its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims in accordance with Accounting Standards Codification 450, Contingencies ("ASC 450")*. The prior accounting treatment, disclosed in our footnotes to our historical financial statements, applied a five-year time horizon; the revised treatment *reflects the full term of epidemiological projections through 2059*. The change was made in consideration of a number of factors, *including the subjective nature of applying a five-year or any other fixed time horizon when estimating liability for unasserted claims, recent changes by several other registrants to accrue for unasserted asbestos claims over the full term of the epidemiological projections and the desire to facilitate comparability among Honeywell, Garrett and their respective peers*.

Our consolidated balance sheets, consolidated statements of operations, consolidated statements of comprehensive income, consolidated statements of shareholders' equity, and consolidated statements of cash flows relative to prior periods will be immaterially revised to correct the Company's application of ASC 450 with respect to Bendix asbestos-related claims.

(emphasis added).

173.   Attached to the August 23, 2018 Form 8-K as Exhibit 99 were restated consolidated balance sheets that showed the impact of the change in accounting methodology. These tables indicated an additional $1.083 billion in asbestos-related liabilities for the quarter ended June 30, 2018 and an additional $1.087 billion in asbestos-related liabilities for the year ended December 31, 2017.

**Asbestos Related Liabilities**

| | Bendix | | |
| | *(in millions)* | | |
| | As Reported | Adjustment | As Revised |
|---|---|---|---|
| December 31, 2017 | $       616 | $       1,087 | $       1,703 |
| Accrual for update to estimated liability | 92 | (4) | 88 |
| Asbestos related liability payments | (98) | – | (98) |
| June 30, 2018 | $       610 | $       1,083 | $       1,693 |

174.   The August 23, 2018 Form 8-K Exhibit 99 states:

## Asbestos Matters

The Company has revised its method for reasonably estimating its liability for unasserted Bendix asbestos- related claims by considering the epidemiological projections through 2059 of future incidence of Bendix asbestos-related disease. Using this method, ***the Company's Bendix asbestos-related liability is estimated to be $1,693 million as of June 30, 2018***. This is ***$1,083 million higher than the Company's prior estimation*** which applied a five-year horizon when estimating the liability for unasserted Bendix asbestos-related claims.

(emphasis added).

175.   As a result, the Company's prior reported financials underestimated its asbestos liabilities attributable to Bendix by over $1 billion. Additionally, Honeywell disclosed that net income attributable to Honeywell for 2017 was

actually $1.545 billion, not the previously reported $1.655 billion. This equated to a 14-cent reduction in the earnings per share of common stock, from $2.14 to $2.00.

| | | Years Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *(Dollars in millions, except per share amounts)* | | | | | | | | |
| | | **2017** | | **2016** | | **2015** | | **2014** | | **2013** |
| **As Reported** | | | | | | | | | | |
| Net income attributable to Honeywell | $ | 1,655 | $ | 4,809 | $ | 4,768 | $ | 4,239 | $ | 3,924 |
| Earnings per share of common stock—basic | $ | 2.17 | $ | 6.29 | $ | 6.11 | $ | 5.40 | $ | 4.99 |
| Earnings per share of common stock—assuming dilution | $ | 2.14 | $ | 6.20 | $ | 6.04 | $ | 5.33 | $ | 4.92 |
| **As Revised** | | | | | | | | | | |
| Net income attributable to Honeywell | $ | 1,545 | $ | 4,812 | $ | 4,771 | $ | 4,262 | $ | 3,922 |
| Earnings per share of common stock—basic | $ | 2.03 | $ | 6.30 | $ | 6.12 | $ | 5.43 | $ | 4.99 |
| Earnings per share of common stock—assuming dilution | $ | 2.00 | $ | 6.21 | $ | 6.04 | $ | 5.36 | $ | 4.92 |

176.  Exhibit 99 to the August 23, 2018 Form 8-K also showed a modest increase in anticipated insurance recoveries for Bendix-related asbestos liabilities. "The Bendix asbestos-related insurance assets are estimated to be $187 million as of June 30, 2018, which is $65 million higher than the Company's prior estimate."

Insurance Recoveries for Asbestos Related Liabilities

| | Bendix | | |
|---|---|---|---|
| | *(in millions)* | | |
| | **As Reported** | **Adjustment** | **As Revised** |
| December 31, 2017 | $     123 | $     68 | $     191 |
| Probable insurance recoveries related to estimated liability | 12 | (3) | 9 |
| Insurance receipts for asbestos related liabilities | (13) | – | (13) |
| June 30, 2018 | $     122 | $     65 | $     187 |

While this adjustment might have initially appeared positive, the increase in anticipated insurance recovery was not nearly proportional to the massive increase in liability, requiring Honeywell to cover considerably more of the liability from their cash reserves.

177.   The above information partially revealed that: (1) Honeywell had been improperly accounting for Bendix's asbestos-related liabilities; (2) Honeywell's true Bendix-related asbestos liabilities was significantly greater than previously represented; (3) that Honeywell could in fact estimate Bendix-related asbestos liabilities for periods greater than five years in the future, contrary to what Honeywell previously told investors; (4) that Honeywell's previous accounting methodology was contrary to, and in violation of, ASC 450; and (5) that Honeywell's internal controls over financial accounting and public disclosures were not designed and/or working properly, as claimed by Adamczyk and Szlosek in their certifications pursuant to the Sarbanes-Oxley Act of 2002.

*August 23, 2018 Press Release and Investor Conference*

178.   On the same day, August 23, 2018, Honeywell issued a press release and held a conference call with investors announcing the impact of the two spin-offs, Garrett and Resideo, on Honeywell stockholders. The press release revealed ostensibly favorable news, including the following: "Garrett and Resideo will make payments to Honeywell under separate indemnification and reimbursement agreements that largely offset Honeywell's related legacy liability spending, including the Bendix asbestos liability that arises from the operations of the legacy Transportation Systems business." In a presentation that accompanied the investor call, Honeywell further clarified that Garrett would cover 90% of Honeywell's

annual Bendix asbestos spending, up to a limit of $175M a year. This agreement would terminate after either: (1) the payments over a 3-year period fell below $25M annually; or (2) on December 31, 2048, whichever came first. Defendants did not explain or reconcile their previous position that they could only estimate the liabilities for a five-year time horizon with the 30-year term for the indemnification agreement.

179. Even though truth about Honeywell's massive asbestos-related liabilities began to be revealed in the August 23, 2018 Form-8K, the simultaneously announced news about the indemnification agreement assuaged analysts and investors. The stock price remained steady, opening on August 23, 2018 at $151.30 per share and closing at $151.35 per share, unadjusted. An analyst report from Deutsche Bank Research explained "[w]e were aware that HON RemainCo's environmental/asbestos expenses would be mitigated by annual payments from Garrett/Resideo, but we view today's news as a positive, given that the payments will amount to up to $315m annually, covering ~90% of HON's annual environmental/asbestos expenses (of ~$350m)." The report weighed the news about the change in accounting methodology against the good news about the spin-offs and stated "Net/net, we view today's news as positive, and expect the stock to outperform modestly." Deutsche Bank, *Our Thoughts on HON's Guidance Raise* (Aug. 23, 2018).

180.   Similarly, an analyst from Barclays stated that after Honeywell's August 23, 2018 announcement, "RemainCo's profile should be more attractive to industrial investors (*especially in light of the ability to 'off-load' environmental and asbestos cash payments*)." (emphasis added). Regarding their target price, Barclays explained: "We restate historical HON financials for the accounting change related to Bendix asbestos liabilities and slightly increase 2018 core forecasts....Our price target moves to $178 from $176 to reflect the change in estimates." Barclays, *Garrett & Resideo Form 10s are a Catalyst, Cash use is in Focus* (Aug. 24, 2018).

181.   Had it not been for the accounting disclosures, the good news about the indemnification and an additional announcement that management raised the full year EPS guidance by $0.05 would have buoyed the stock price much higher.

182.   Despite the disclosures in the August 23, 2018 Form 8-K, Honeywell continued to conceal the truth from investors. Neither the Form 8-K nor the accompanying exhibit fully disclosed: (1) management's involvement in and responsibility for estimating Bendix-related asbestos liabilities; (2) that the accounting process and controls for estimating Bendix-related asbestos liabilities involved an intentional decision to ignore liabilities potentially arising more than five years into the future; or (3) that Defendants knew that the accounting process used for estimating Bendix-related asbestos liabilities was in violation of ASC 450,

generally accepted accounting principles, and industry norms. Moreover, Honeywell did not disclose, but instead concealed, that its decision to change its accounting processes for Bendix liabilities was brought about by communications with the SEC's Division of Corporation Finance beginning in May, 2018.

### *October 10, 2018 Release of SEC Correspondence*

183.   On October 10, 2018, the SEC made public correspondence between its Division of Corporation Finance and Honeywell dated August 14, 2018 and August 20, 2018. On October 10, 2018, the letters were listed chronologically on the SEC's website under the dates they were sent, August 14 and August 20. This caused them to appear lower that Honeywell's more recent filings on the list of documents returned when conducting an online search for the Company. In its letter dated August 14, 2018, the SEC stated, in pertinent part:

> We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO- related asbestos liability. In your response, also please provide us with an *analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods*. To the extent you determine that the specific future time periods used were incorrect, please provide us with a materiality analysis and your assessment of whether there was a material weakness in internal controls over financial reporting.
>
> We remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff.

(emphasis added).

184.   On August 20, 2018, John Tus, Honeywell's former Vice President and Controller, responded to the SEC via letter. Each page of the letter was marked "Confidential treatment Requested by Honeywell International, Inc." In the August 20, 2018 letter, Tus stated:

> As described in more detail below and in the Appendices hereto, **we are proposing to change our accounting treatment for Bendix asbestos-related liabilities to a terminal value time horizon.** We also discuss our materiality analysis related to that revision and our conclusion that the revision we intend to make does not indicate a material weakness in our internal control over financial reporting.
>
> \*\*\*
>
> **Upon thorough consideration of the Staff's comments** in its review of the Form 10 submitted to the Staff in connection with the proposed spin-off of Garrett Motion Inc. and of the application of ASC 450, **Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims**. Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability. The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims.
>
> It is important to note that, unlike the NARCO Trust, Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical claims information on which to rely when estimating a future projection of liability. Each year, we have a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support

reliable estimates. ***The robustness of this data supported our conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450***.

(emphasis added).

185.   The above statements revealed to the market that Honeywell's previous statements regarding accounting for the Bendix-related asbestos liabilities were materially false and misleading. Contrary to Honeywell's previous statements that "we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years," this letter revealed Honeywell did in fact have data to support accounting for the full term. This statement also revealed that Honeywell had been discussing this matter with the SEC since its review of Garrett's Form 10, months before Honeywell disclosed their new accounting practice.

186.   Incorporated to Honeywell's letter to the SEC was Appendix A that contained additional disclosures relating to Honeywell's prior improper accounting. Appendix A states:

> Additionally, management has evaluated the circumstances around the Bendix asbestos liability error detailed above to determine whether it is an indicator of a material weakness in financial reporting controls. Based on the quantitative and qualitative considerations discussed below ***we concluded we have a significant deficiency and not a material weakness in internal controls over financial reporting related to our determination of the time horizon for the Bendix-related asbestos liability.***

(emphasis added).

187.    This revealed to the market that Honeywell had a significant deficiency it its internal controls over financial reporting and as a result, the accounting for Bendix-related asbestos liabilities, as well as Defendants SOX certifications were materially false and misleading.

188.    Appendix A continued, discussing the accounting error and the effects it had on net income and comprehensive income, stating:

- Under the iron curtain method, the effects of a cumulative correction on the Company's projected 2018 income statement, however, would be material. For instance, *__the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income.__* This would represent a greater than 10% impact on both of the forecasted 2018 amounts. Accordingly, *we have concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods.*

- In order to assess whether the revision for this error represents a material restatement or immaterial restatement (i.e. revision), we utilized the rollover method to quantify the amount by which each affected income statement and statement of cash flows in the last five years was actually misstated, and quarterly periods for the latest two years. Additionally, as part of this analysis, we calculated the cumulative effect of the uncorrected error on the balance sheets at the end of each such period. The rollover method analysis indicates that the restatement is not quantitatively material because the effects of the error on the misstated income statements, statements of cash flows and balance sheets of those prior periods is less than 5% of all key metrics in each period, *with the exception of net income (-6.5%) and comprehensive income (- 5.0%) for the year ended December 31, 2017.*

(emphasis added).

189.   This statement revealed to the market that Honeywell would have to issue a restatement for Bendix-related asbestos liabilities, and the negative affect it would have on net income and comprehensive income. This revealed that the prior numbers relating to Bendix's asbestos-related liabilities and net income disseminated by Honeywell were in fact, materially false and misleading.

190.   Appendix A then discussed exactly how long Honeywell could estimate its liabilities for, and the factors used to decide to correct the error.

> As indicated previously, in August 2018, ***management concluded it should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450, Contingencies, in measuring its Bendix asbestos liability related to unasserted claims***. This error, and the related control deficiency, were identified during the course of the SEC Staff's review of the Form 10 filing related to Garrett Motion Inc.
>
> Our conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), (ii) ***noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies*** (again because of such time horizon subjectivity), and (iii) ***concluding that such an adjustment would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers***. Therefore, with the assistance of an external specialist, and utilizing a model with actuarial inputs, Honeywell has and will continue in the future to consider the full term of epidemiological projections of future incidents of asbestos-related disease to estimate its probable and reasonably estimable Bendix asbestos- related liability.

(emphasis added).

191.   This statement revealed to the market that Honeywell should have been recording Bendix's asbestos-related liabilities out to 2059, not just a five-year horizon as it had done historically. This demonstrated that Honeywell's prior statement that Honeywell did not have a reasonable basis for estimating asbestos claims beyond the next five years, was materially false and misleading.

192.   Appendix A also identified the control that was deficient and the root cause for the deficiency. Specifically, Appendix A states:

> *Control Identified*
>
> *The error that was identified is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted.*
>
> As noted in the summary of the accounting process for unasserted claims above, we use a third-party specialist to assist in assessing the required Bendix unasserted claims liability. The Company has designed a relevant internal control over that process. *We identified an operating effectiveness deficiency related to that internal control activity.* The specific control activity is the "Bendix Reserves True-up" control, which states that "…Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management." This key control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix-related asbestos reserves are adjusted to properly reflect current year estimates

regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. *Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims*. Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

***

Nature and Root Cause

[I]n connection with the performance of this control, the Company inappropriately relied on *limited objective and verifiable data to justify its use of a five- year horizon*. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. *The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence.*

(emphasis added).

193.   The above information revealed the extent of the control weakness and the fact that Honeywell ignored information when determining the horizon for Bendix's asbestos-related liabilities. This showed that the prior statements that Honeywell did not have a reasonable basis for estimating asbestos claims beyond the next five years, as well as Defendants' SOX certification were materially false

89

and misleading.

194.   Appendix A also informed investors that Honeywell had the information needed to determine the deficiency at an earlier point. Specifically, Appendix A states:

> ***We concluded it was appropriate to revise prior periods when correcting the error under SAB 99***. This consideration implies that ***there was information available that should have caused us to modify the time horizon used for the Bendix unasserted claims liability at an earlier point.*** The specific time horizon is subjective in nature given the assessment of all available information.

(emphasis added).

195.   This statement again revealed to the market that the error was so severe that it would result in a restatement. This revealed that the prior numbers relating to Bendix's asbestos-related liabilities and net income disseminated by Honeywell were, in fact, materially false and misleading.

196.   This also informed investors that Honeywell had the information to find the error well before Honeywell decided to review or disclose it. This shows the extent of Honeywell's internal weakness, and that its previous SOX certification were materially false and misleading.

197.   Appendix A also determined that Defendants' prior SOX certifications were materially false and/or misleading. Specifically, Appendix A states:

**SOX 404 Assessment Conclusion**

90

Based on the considerations above, we concluded that there was not a material weakness in internal control. However, we determined that the deficiency is important enough to merit the attention of those responsible for oversight of the Company's financial reporting and internal controls, and therefore *Management concluded that a significant deficiency in internal controls over financial reporting existed*. Specifically, the identified Bendix asbestos control did not operate effectively because the Company inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. We did not consider all available evidence to evaluate whether we should apply the full term of the epidemiological studies. The Company focused too heavily on the emerging science and studies that indicated the nature and application of the asbestos used at Bendix does not cause disease, and on evidence of improvements in the tort system with regards to resolution of asbestos claims.

(emphasis added).

198.   This correspondence revealed to the market that Honeywell's previous SOX certifications were in fact false due to a significant deficiency internal controls over financial reporting.

199.   Despite the admissions and revelations contained in Honeywell's August 20, 2018 correspondence with the SEC, it still misled investors by attempting to portray Honeywell's conduct in a nonculpable light. Moreover, given the manner in which the correspondence was released, many investors were unaware of Defendants' admissions or that it had engaged in an intentional violation of generally accepted accounting standards when providing the public with estimates of its Bendix-related asbestos liabilities.

<u>*October 10, 2018 Press Release and Investor Conference*</u>

200.   Before market open on October 10, 2018, Honeywell issued a Press Release revealing that Resideo would be spun-off on October 29, 2018, earlier than previously expected, and announcing a flash Investor Showcase and Technology Demonstration. Later that day Honeywell held the conference and announced sales growth in each of the business segments that would become part of the Resideo spin-off. New management also assuaged investor fears about competition from other retailers, such as Amazon Alexa and Home Depot, and announced plans to expand in high-growth areas like China and India.

201.   Resideo's indemnification agreement with Honeywell was discussed at length on the call. Joseph Ragan, Resideo's new Executive Vice President and CFO, explained that the liability was capped at $140 million per year, that it was a 25-year arrangement, and that Resideo had already modeled the liability into their numbers. In the question and answer portion of the call, Nefkens again clarified that the liability could be as much as $140 million per year. Dean Acosta, Chief Communications Officer for the new spin-off, also jumped in to clarify "[w]e don't manage the remediation. All of that's done by Honeywell."

202.   Just as before on August 23, 2018, the subsequent analyst reports focused on the positive news Honeywell strategically announced on the same day the SEC published its correspondence questioning Honeywell's accounting practices. Barclays published a report after the conference noting "[w]e attended

Resideo's inaugural investor meeting in New York earlier today, ahead of its spin out of HON. The spin looks on track to occur later this month…and, along with the completed spinoff of Garrett Motion, should act as a catalyst for HON…." The report also noted as a "key point" that "[t]he indemnification and reimbursement agreement is for 25 years, with a maximum cash payment capped at $140m in any one year (exclusive of any late payment fees up To 5% per year); the payment is the lesser of $140m or 90% of HON's net spend for this. HON retains the liability and is responsible for asbestos management and remediation." Barclays, *REZI Investor Meeting; Implications* (Oct. 10, 2018).

203.   A William Blair report published the day after the Resideo call noted "Honeywell's free cash flow should be enhanced about 4%-5% annually by effectively transferring about 90% of the annual cost to service Honeywell's $2.4 billion in legacy asbestos and environmental liabilities." The report also explained Resideo would "pay Honeywell up to $140 million annually to service its legacy environmental liabilities." William Blair, *Resideo Spin-Out Effective October 29; Solid Prospects and Honeywell's Free Cash Flow Will Benefit From Reduced Legacy Costs* (Oct. 11, 2018). Similarly, Wolfe Research raised its target price for Resideo from $5 per Honeywell share to $6 per Honeywell share (for every six shares of Honeywell, investors were given one share of Resideo), factoring the $140 million annual environmental payment into its model. Wolfe Research,

*Thoughts Post REZI Analyst Day* (Oct. 11, 2018).

204.   The stock price declined, from an opening market price of $155.76 on October 10, 2018 to an unadjusted closing price of $148.86 per share on October 11, 2018.

<u>*October 19, 2018 Form 10-Q*</u>

205.   The full extent of Honeywell's improper accounting for its asbestos liability attributable to Bendix was revealed on October 19, 2018, when Honeywell issued a press release announcing its third quarter 2018 earnings, which was also attached as Exhibit 99 to Form 8-K, and filed its quarterly report with the SEC for the quarter ended September 30, 2018.

206.   In the Q3:18 10-Q, Honeywell disclosed the following:

In the third quarter of 2018, the Company revised its accounting to correct the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims. The prior accounting treatment applied a five-year time horizon; ***the revised treatment reflects the full term of epidemiological projections through 2059. Previously issued financial statements have been revised for this correction with the following effects: The Company's revised estimated asbestos-related liabilities are now $2,610 million as of December 31, 2017, which is $1,087 million higher than the Company's prior estimate***. The Company's Insurance recoveries for asbestos-related liabilities are estimated to be $503 million as of December 31, 2017, which is $68 million higher than the Company's prior estimate.

*** 

This revision followed the Securities and Exchange Commission (SEC) Division of Corporation Finance review of our Annual Report on Form 10-K for 2017, which included review of our prior accounting for liability for unasserted Bendix-related asbestos claims.

> ***On September 13, 2018, following completion of Corporation
> Finance's review, the SEC Division of Enforcement advised that it
> has opened an investigation related to this matter***. Honeywell intends
> to provide requested information and otherwise fully cooperate with
> the SEC staff.

(emphasis added).

207.   This statement revealed to the market the true extent of Honeywell's accounting errors. The statement also revealed the fact that Honeywell was under a formal investigation by the SEC in connection with its accounting for asbestos liabilities. Whereas prior disclosures claimed that Honeywell was justified in its accounting treatment for Bendix-related asbestos liabilities, the fact that the SEC was investigating Honeywell for exactly that matter cast significant doubt on the Company's prior statements. The fact of the matter was that Honeywell had intentionally violated generally accepted accounting principles and now, as a result, the Company was under investigation by the SEC's Division of Enforcement.

208.   On October 22, 2018, Garrett, Honeywell's recent spinoff, filed a Form 8-K with the SEC in an attempt to distance itself from the mess Honeywell had created. It stated:

> On Friday, October 19, 2018, Honeywell disclosed in its Quarterly
> Report on Form 10-Q for the quarter ended September 30, 2018 (the
> "Honeywell Form 10-Q") that the Division of Enforcement of the
> Securities and Exchange Commission (the "SEC") ***has opened an
> investigation into Honeywell's prior accounting for liability for
> unasserted Bendix-related asbestos claims***. In addition, Honeywell

noted that it revised certain previously issued financial statements to correct the time period associated with the determination of appropriate accruals for legacy Bendix-asbestos related liability for unasserted claims … Prior to the filing of the Honeywell Form 10-Q with the SEC, management was not aware of the SEC's investigation into Honeywell's prior accounting."

(emphasis added).

## J.    Defendants Acted with Scienter.

209.   After becoming CEO on March 31, 2017, Adamczyk and his management team (including Szlosek and Lewis) engaged in a comprehensive review of Honeywell's portfolio. During that review, Adamczyk, Szlosek and Lewis contrived a scheme to improve market perception of Honeywell by eliminating costly legacy asbestos and environmental liability from its balance sheet through the process of spinning-off two components of Honeywell's business.

210.   In an October 10, 2017 8-K press release, Honeywell announced "its intention to separately spin off its Homes product portfolio and ADI global distribution business, as well as its Transportation Systems business, into two stand-alone, publicly traded companies." In the press release, Honeywell acknowledged that the new Homes and Global Distribution business, which would later become Resideo Technologies, Inc., would have "financial responsibility for certain Honeywell legacy liabilities," while the new Transportation Systems business, Garrett Motion, Inc. would have "financial responsibility for Honeywell

legacy automotive segment liabilities in an amount equal to [the company's] Bendix legacy asbestos liability."

211.   In order to facilitate disposition of Honeywell's Bendix asbestos liabilities via the Garrett spin-off, Defendants intentionally understated those liabilities in violation of GAAP.

212.   Honeywell intentionally used a five-year horizon to estimate its Bendix exposure, as admitted by Honeywell in the 2017 10-K. In pertinent part, Honeywell explained that: "The liability for future claims represents the estimated value of future asbestos-related bodily injury claims expected to be asserted against Bendix over the next five years … In light of the uncertainties inherent in making long term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years."

213.   Honeywell knew that using a five-year horizon was improper under ASC 450 and materially false and misleading to its shareholders. At all relevant times during the Class Period, Honeywell maintained a "control" during the Class Period that systematically yielded a favorable Bendix exposure figure. The control, as admitted by Tus in his August 20, 2018 letter to the SEC, "inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. The Company had obtained and used the data to properly value a liability, but made the

incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five- year horizon. The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

214.   Honeywell's accounting fraud did not go unchecked. As discussed above, the SEC's Division of Corporation Finance notified Honeywell that the Company's accounting for Bendix-related asbestos liabilities was in violation of ASC 450 on May 24, 2018. Su Ping Lu, Honeywell's Assistant General Counsel and Assistant Corporate Secretary who acted as the sole director for Garrett during the spin-off process, received the SEC's letter and subsequent correspondence.

215.   John C. Kennedy, an attorney at Paul, Weiss, Rifkind, Wharton & Garrison LLP, also received the SEC's May 24, 2018 letter and subsequent correspondence. Paul Weiss was Honeywell's corporate counsel at all relevant times during the Class Period. Significantly, Paul Weiss (and Mr. Kennedy in particular along with several other attorneys) represented Honeywell in its spin-off of Garrett.

216.   A four-month long chain of correspondence followed this May 24 letter in which the SEC repeatedly asked for justification for Honeywell's use of the five-year time horizon and Honeywell consistently and unsuccessfully tried to

defend their choice to use this favorable period. Eventually, Honeywell admitted "that it had not appropriately applied the provisions of ASC 450 when measuring its asbestos liabilities related to unasserted Bendix claims." Knowing the news would not reflect favorably on it, Honeywell requested confidential treatment of this chain of correspondence.

217.   Consequently, by July 20, 2018, the date of Honeywell's Q2:18 10-Q, Honeywell and its counsel had already communicated at length with the SEC about their treatment of the Bendix-related asbestos liabilities. In fact, on June 29, 2018, Honeywell admitted to the SEC in then-confidential correspondence that it was possible to calculate the Bendix-related asbestos liabilities beyond the five years by using an extrapolation. "Based on this mathematical extrapolation, such calculation generated an estimated reasonably possible exposure over the full term of the epidemiological projections for potential claims not yet asserted of $1.3 billion as of December 31, 2017." Notwithstanding, Defendants continued to provide investors with the materially false and misleading estimate of Honeywell's Bendix-related asbestos liabilities using a five-year time horizon in the Q2:18 10-Q.

218.   Just a few weeks later, on August 8, 2018, Lu wrote a letter to the SEC in which she stated "Upon **thorough and thoughtful consideration** of the Staff's comments and of the appropriate application of Accounting Standards Codification 450, Contingencies ("ASC 450"), **Honeywell has determined that it**

*had not appropriately applied the provisions of ASC 450 when measuring its asbestos liabilities related to unasserted Bendix claims*. Specifically, Honeywell concluded that the appropriate application of ASC 450 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in its measurement of such liability." (emphasis added). Lu did not explain why such "thorough and thoughtful consideration" had not occurred prior to the Q2:18 10-Q filing.

219.   The August 8, 2018 letter continued, "As a result of the foregoing, *Honeywell plans to revise its historical consolidated financial statements* in future filings to reflect the full term of the epidemiological projections in its measurement of liability for unasserted Bendix-related asbestos claims." (emphasis added). However, Honeywell did not release such revisions until after receiving further correspondence from the SEC. As Honeywell had requested confidential treatment of this correspondence, the public was still unaware of the magnitude of the liability.

220.   On August 14, 2018, the SEC's Division of Corporation Finance notified Honeywell that the Company's accounting for Bendix-related asbestos liabilities was in violation of ASC 450. On August 20, 2018, John Tus, Honeywell's Vice President and Controller, responded to the SEC by agreeing with their position and admitting that Honeywell had been improperly accounting

for its Bendix-related asbestos liabilities.

221.   Tus acknowledged that ASC 450 was "the authoritative accounting standard under U.S. GAAP concerning loss contingencies" and that it required Honeywell to "accrue for a loss when that loss is both probable and reasonably estimable (ASC 450-20-25-2)." Tus also acknowledged that "Honeywell determined that [it] had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims. Specifically, [it] concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability" and not, as it had been doing, accounting for only a five-year horizon.

222.   Significantly, Tus further confirmed that this control was developed and/or approved by Honeywell's "Management," *i.e.*, Adamczyk, Szlosek, and Lewis. Tus wrote that the Bendix reserves are "approved by Management" after "Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions."

223.   Tus also wrote that "Management" was responsible for approving the

time horizon used for determining the value of the liability. "Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims. Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger."

224.   Further establishing scienter on the part of Honeywell, Adamczyk, Szlosek, and Lewis is the fact that its accounting for Bendix liability was different from and at odds with its accounting for other asbestos-related liability, namely the NARCO asbestos liability. For NARCO, Honeywell estimated asbestos-related liability across a 15-year timeline. Thus, despite the fact that Honeywell had less "real-time data of claims asserted, dismissal rates and resolution values" than it had for Bendix, Honeywell was still able to comply with ASC 450. Honeywell's accounting for NARCO, therefore, shows that the Company knew how to comply with ASC 450 but intentionally declined to do so.

225.   Honeywell's decision to use a five-year horizon was also at odds with and contrary to industry practices, as evidenced by the accounting practices of other companies with asbestos-related litigation exposure. Indeed, as stated in the appendix to Honeywell's August 20, 2018 response to the SEC, its "conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the

highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), [and] (ii) noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity)….The Company also had conversations between management, its third-party specialists and outside counsel about what appeared to be a movement of companies to extend out the time horizon."

226. For example, Dow Chemical Company had been estimating the potential asbestos liability for its Union Carbide subsidiary for 15-year periods since 2002 and in 2016 began providing for potential future asbestos liability through to 2049. Similarly, Owens-Illinois, Inc., another company widely known for its asbestos-related liability exposure, had been estimating its exposure by using an annual rolling estimate over three-year periods. In May 2016, Owens-Illinois revised its accounting estimates to reflect potential liability over an indefinite period of time into the future. Owens-Illinois changed its accounting for asbestos-related liability in response to direction from the SEC. In 2016, Crown Holdings, Inc. also changed its accounting for asbestos related liabilities. Previously, Crown Holdings, Inc. "estimated probable costs for claims through the year 2025." However, beginning in Crown Holdings, Inc. Form 10-K for year-end 2016, Crown Holdings began accounting for asbestos-related liabilities "without

limitation to a specified time period."

227.   In 2007, Ingersoll-Rand changed its accounting under ASC 450 for asbestos-related liabilities from seven years into the future out until 2053, "the period over which the Company has and is likely to resolve asbestos-related claims against it in the future." Further, since 2007, the 3M Company has projected its asbestos-related liability out based on the amount of future projected claims for an indefinite period of time into the future.

228.   Notwithstanding the above, Honeywell continued to use a five-year horizon. As a result, Honeywell was able to conceal over $1.1 billion of additional asbestos-related exposure. In turn, Honeywell was able to inflate its net income by 6.5% and comprehensive income by 5% for the year ended December 31, 2017 (excluding Honeywell's provision for tax reform in 2017). This resulted in a 14-cent reduction in the earnings per share attributable to Honeywell in 2017, from $2.14 to $2.00.

229.   Adamczyk, as CEO, and Szlosek, as CFO from the beginning of the Class Period through August 3, 2018, were responsible for all of Honeywell's actions, including its day-to-day affairs as well as the contents of the quarterly and annual reports that Honeywell filed with the SEC. Therefore, Adamczyk and Szlosek acted with scienter by causing Honeywell to make the misleading Bendix disclosures.

230.   Lewis, as CFO from August 3, 2018 through the end of the Class Period, acted with scienter when stating on July 20, 2018 Earnings Call that SEC comment process with respect the Garrett and Resideo Form 10s was "going well" as he possessed all the same information as defendants Adamczyk and Szlosek. Lewis began transitioning into his new role as CFO on May 1, 2018, at which time he worked closely with Adamczyk and Szlosek. Even before the transition began, as the Vice President of Corporate Finance, Lewis had intimate knowledge of Honeywell's accounting operations, including the facts underlying the materially false and misleading statements and omissions alleged in this complaint.

231.   Proof of scienter on the part of Adamczyk and Szlosek is evident in the fact that they signed certifications under the Sarbanes-Oxley Act of 2002 in connection with Honeywell's quarterly and annual reports. These certifications represented that Adamczyk and Szlosek "certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that….[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." This was not true and, as established above, Adamczyk and Szlosek knew it.

232.   In particular, Adamczyk and Szlosek certified the accuracy of the Q2:18 10-Q despite being aware that Honeywell was improperly accounting for its Bendix-related asbestos liabilities. As stated in Honeywell's August 20, 2018

response to the SEC, Honeywell was aware of "the error" pertaining to its liability estimates "subsequent to the quarter ended June 30, 2018," yet Adamczyk and Szlosek certified the Q2:18 10-Q (dated July 20, 2018) notwithstanding.

233.   Moreover, during the course of the Class Period, Adamczyk and Szlosek repeatedly attempted to conceal and/or cover up disclosures about the Company's accounting scheme. On August 23, 2018, Honeywell timed the filing of its Form 8-K detailing the change in accounting procedure for the Bendix-related asbestos liabilities and the need for it to restate its prior financial statements to coincide with a press release detailing several positive developments within Honeywell. This news included the issuance of Form 10's relating to the Company's spin-offs Garrett and Resideo. and an upward revision of full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20).

234.   Honeywell's August 23, 2018 press release also emphasized details regarding the indemnification agreements contained within the Form 10 registration statements submitted for Garrett and Resideo. "As previously communicated, after the Garrett and Resideo spins are complete, each company will fund a portion of Honeywell's legacy liabilities, making our balance sheet, earnings potential and ongoing cash flow generation even stronger than they are today." "Garrett and Resideo will make payments to Honeywell under separate indemnification and reimbursement agreements that largely offset Honeywell's

related legacy liability spending, including the Bendix asbestos liability that arises from operations of the legacy Transportation Systems business. Under the indemnity agreements, 90% of Honeywell's Bendix asbestos and a subset of its environmental spending (net of 90% of related insurance receipts and certain other recoveries) is expected to be offset by future payments from Garrett and Resideo."

235.   The press release did mention the change in accounting treatment for the Bendix-related asbestos liabilities, but failed to disclose material facts from the Form 8-K, such as the fact that adjustment would result in over a billion dollars in increased liability and that the change was prompted by firm guidance from the SEC. Instead, Honeywell implied that it had reviewed their accounting policies and reached the decision itself "[a]fter careful deliberation."

236.   Defendants' strategy worked, as analysts and the market largely ignored the news about the Bendix estimates and faulty internal controls, instead focusing on the news that 90% of Honeywell's Bendix asbestos liabilities would be assumed by Garrett. Indeed, Deutsche Bank wrote on August 23, 2018, "[n]et/net, we viewed today's news as positive, and expect the stock to outperform modestly on the back of the guidance raise and spin progress." Deutsche Bank, *Our Thoughts on HON's Guidance Raise* (Aug. 23, 2018). In another August 23, 2018 note, Deutsche Bank wrote "[t]he most material source of the lower dilution estimate comes from the company's indemnity agreements, whereby the SpinCos

will pay ~90% of RemainCo's annual asbestos/environmental expenses, which amount to ~$0.40 annual EPS benefit for RemainCo," and that Honeywell would "benefit from much lower environmental/asbestos expenses…." Deutsche Bank, *What we learned from the Form 10's* (Aug. 23, 2018).

237.   Similarly, RBC Capital Markets wrote on August 23, 2018, that "the accounting revision [would] have an immaterial positive impact to its full year 2018 adjusted EPS." RBC Capital Markets, *HON – Turbo and Homes Spins on Track; Boosts 2018 EPS Guidance by 5c/0.6%* (Aug. 23, 2018). Barclays took the change in accounting treatment into consideration, but balanced against the positive news, it only resulted in a $2.00 decrease in their target price. "We restate historical HON financials for the accounting change related to Bendix asbestos liabilities and slightly increase 2018 core forecasts….Our price target moves to $178 from $176 to reflect the change in estimates." Barclays, *Garrett & Resideo Form 10s are a Catalyst, Cash use is in Focus* (Aug. 24, 2018).

238.   Defendants' timing of the August 23, 2018 press release was not a coincidence. They employed similar tactics on October 10, 2018. Despite the SEC's release of negative information in the form of previously confidential correspondence with Honeywell regarding its accounting for, *inter alia*, Bendix-related asbestos liabilities, Honeywell did not issue a press release or address the correspondence in any way. Instead, before the market opened on October 10,

2018, Honeywell issued a press release announcing a flash investor showcase and technology demonstration for one of its spin-offs, Resideo. Additionally, the SEC listed the letters chronologically on its website under the dates they were sent, August 14 and August 20. This caused them to appear lower that Honeywell's more recent filings on the list of documents returned when conducting an online search for the Company.

239. As a result of the foregoing, the only analyst report covering Honeywell published on October 10, 2018 focused exclusively on the Resideo spin-off and did not mention the SEC's contemporaneous release of the Honeywell correspondence at all. Barclays wrote "[w]e attended Resideo's inaugural investor meeting in New York earlier today, ahead of its spin out of HON. The spin looks on track to occur later this month…and, along with the completed spinoff of Garrett Motion, should act as a catalyst for HON…." Barclays, *REZI Investor Meeting; Implications* (Oct. 10, 2018). The report also noted as a "key point" that "[t]he indemnification and reimbursement agreement is for 25 years, with a maximum cash payment capped at $140m in any one year (exclusive of any late payment fees up To 5% per year); the payment is the lesser of $140m or 90% of HON's net spend for this. HON retains the liability and is responsible for asbestos management and remediation." Barclays, *REZI Investor Meeting; Implications* (Oct. 10, 2018).

240.   A William Blair report published the day after the Resideo call noted "Honeywell's free cash flow should be enhanced about 4%-5% annually by effectively transferring about 90% of the annual cost to service Honeywell's $2.4 billion in legacy asbestos and environmental liabilities." The report also explained Resideo would "pay Honeywell up to $140 million annually to service its legacy environmental liabilities." William Blair, *Resideo Spin-Out Effective October 29; Solid Prospects and Honeywell's Free Cash Flow Will Benefit From Reduced Legacy Costs* (Oct. 11, 2018). Similarly, Wolfe Research raised its target price for Resideo from $5 per Honeywell share to $6 per Honeywell share (for every six shares of Honeywell, investors were given one share of Resideo), factoring the $140 million annual environmental payment into its model. Wolfe Research, *Thoughts Post REZI Analyst Day* (Oct. 11, 2018).

241.   The change in accounting practice was described in Defendant's October 19, 2019 Form 10-Q, but the press release that accompanied the quarterly filing did not address the change in guidance nor the news that the SEC had begun an investigation of Honeywell's accounting practices, instead focusing on the "exciting" fact that "[t]he portfolio changes we announced at this time last year are nearly complete…." Neither were they discussed on the Investor Call on October 19, 2018, except for one sentence by Lewis, Szlosek's replacement as CFO: "In August, we raised our guidance to $8.10 to $8.20 based primarily on a stronger

outlook for the second half of the year **with a small contribution from our change in asbestos accounting**." (emphasis added).

242.   Given the nature of the materially false and/or misleadings statements, Honeywell acted with corporate scienter. It is implausible that Honeywell would have made the statements it did in its filings with the SEC unless its senior management approved the statements and authorized their filing.

243.   Moreover, successful implementation of the Garrett spin-off not only benefitted Honeywell by disposing its balance sheet of the significant Bendix-related asbestos liabilities, but it also benefitted both Adamczyk and Szlosek through their executive compensation plans. In its 2018 Proxy Statement, Honeywell included Szlosek's role in building "the Transportation Systems and Homes spin-off models and establish[ing] transition teams and plans, including a roadmap for stranded cost elimination" as a qualitative component of his executive compensation award. Similarly, Honeywell included Adamczyk's role in leading the "strategic review of Honeywell's business portfolio that resulted in [the] October 2017 [spin-off] announcement" and his role in "provid[ing] indemnity protection to Honeywell for environmental and asbestos liability payments" as a qualitative factors for Adamczyk's incentive compensation in the 2018 and 2019 Proxy Statements, respectively.

**K.      Additional Scienter Allegations**

244.   On May 1, 2018, Garrett filed its Draft Registration Statement with the SEC. That same day, Honeywell filed a Form 8-K with the SEC announcing 54-year-old Szlosek was "retiring" effective August 3, 2018, citing only "personal reasons," at which point Gregory P. Lewis would assume the role of CFO.

245.   Szlosek had worked for Honeywell since 2004 and served as Honeywell's CFO since 2014. Further, despite being touted as having "[b]uilt the Transportation Systems and Homes spin-off models and established transition teams and plans, including a roadmap for stranded cost elimination" in Honeywell's 2018 Proxy Statement, Szlosek's "retirement" nevertheless coincided with the Company's announcement and implementation of those very spin-offs.

246.   On July 27, 2018, Honeywell's Board of Directors voted to appoint Lewis as its new CFO. Thereafter, on August 2, 2018, Honeywell filed a Form 8-K with the SEC announcing that Szlosek would "remain an employee of the Company through October 5, 2018…and then [would] continue to make himself reasonably available to the Company, as needed through December 31, 2018." Despite Honeywell's initial indication that Szlosek was "retiring," his agreement with the Company included a clause regarding future employment, which stated that Szlosek could not become employed by any other entity during the transition services period "without the consent of the Company's Chief Executive Officer"

unless he became employed with a "non-publicly traded entity after November 30, 2018" in which case consent was no longer necessary.

247. In return for entering into extended post-employment non-competes and for providing transition services, "Szlosek was permitted to retain the restricted stock unit awards previously granted to him [by Honeywell], which would vest in the future on their original vesting dates[.]"

248. Szlosek did not actually "retire" after leaving Honeywell. In December of 2018, he assumed the role of CFO for Avantor Inc. ("Avantor"), a now publicly traded company, listed on the New York Stock Exchange as of May 17, 2019, with less than one-tenth the market capitalization and approximately one-tenth the average share price of Honeywell. Szlosek's move from Honeywell, a Fortune 100 company, to Avantor, a fledging chemical manufacturer, came with a significant decrease in compensation. In 2017, Honeywell paid Szlosek a base salary of $865,039, a bonus of $1.1 million and a total annual direct compensation of $7,889,839. While Avantor has not yet filed a proxy statement for 2019 detailing Szlosek's total compensation, his employment agreement shows his base salary dropped to $600,000 per year and his target bonus was only $900,000. Even though Szlosek also received options and restricted stock in the new company, the value of these shares of Avantor–whose maximum value since its IPO was only $19.58 per share–is far less than the value of the incentives given to him by

Honeywell, whose common stock reached as high as $183.12 per share in the last year.

249.   On June 19, 2018, Honeywell filed a Form 8-K announcing the resignation of Jennifer H. Mak, the Company's Vice President and Controller. Ms. Mak signed several of the SEC filings referenced herein on behalf of Honeywell, including the Form 10-K for the year ending December 31, 2017 and the Q1:18 10-Q. The Company announced that John J. Tus would succeed her effective June 29, 2018 "as Vice President and Controller of the Company and to serve as the Company's principal accounting officer." Tus' succession was not long lived. Just over a year later, on July 8, 2019, Honeywell issued a Form 8-K announcing Tus' intention to retire from the Company.

250.   Garrett and Resideo, Honeywell's spin-off companies, also experienced a series of corporate resignations and terminations.

251.   On September 30, 2018, just one day prior to the completion of the Garrett spin-off, Lu – Garrett's sole-director and President – resigned from her position as director and ceased serving as President. Peter Bracke, who served as Garrett's Acting Chief Financial Officer, ceased performing his duties on October 1, 2018, "immediately prior to the appointment" of Russell James as Vice President and Corporate Controller and of Alessandro Gili as Senior Vice President and CFO.

252.   Approximately one year later, Garett issued a Form 8-K announcing that Gili was resigning from Garrett effective September 30, 2019. At that time, Garrett indicated that Bracke would serve as its interim CFO and principal financial officer, while Garrett searched for a permanent successor.

253.   Similarly, on October 28, 2018, the day prior to the completion of the Resideo spin-off, Jacqueline W. Katzel – Resideo's sole-director and President – resigned from her position as director. Katzel also ceased serving as President "immediately prior to the appointment" of Michael H. Nefkens as President and Chief Executive Officer on October 29, 2018. That same day, Joseph D. Ragan III was appointed as Resideo's Executive Vice President and Chief Financial Officer; however, he was terminated from the position just over a year later on November 6, 2019.

254.   On December 2, 2019, Resideo issued a Form 8-K announcing "a CEO transition" and noting that Nefkens would "remain in his position…as President and Chief Executive Officer until his successor [was] appointed, at which time Mr. Nefkens [would] also resign from the board."

**L.   Post-Class Period Events Confirm Scienter**

255.   On February 20, 2019, Garrett filed a Form 8-K with the SEC attaching a press release announcing fourth quarter and full year financial results for the year ended December 31, 2018. In that press release, Garrett revealed the

following:

> In the course of preparing our Annual Report on Form 10-K and our
> Consolidated and Combined Financial Statements for the year ended
> December 31, 2018, our management determined that there is a
> material weakness in our internal control over financial reporting
> relating to the supporting evidence for our liability to Honeywell
> under the Indemnification and Reimbursement Agreement.
> Specifically, we are **unable to independently verify the accuracy of
> the certain information Honeywell provided to us that we used to
> calculate the amount of our Indemnification Liability**, including
> information provided in Honeywell's actuary report and the amounts
> of settlement values and insurance receivables. For instance,
> Honeywell did not provide us with sufficient information to make an
> independent assessment of the probable outcome of the underlying
> asbestos proceedings and whether certain insurance receivables are
> recoverable.
>
> We are working to obtain additional information about the
> Indemnification Liability through a dialogue and iterative process
> with Honeywell. We are still engaged in that process, and it remains a
> high priority for the Company.
>
> (emphasis added).

256.   On March 1, 2019, Garrett filed its Form 10-K with the SEC reporting

fourth quarter and full year financial results for the year ended December 31, 2018.

In that 2018 10-K, Garrett added the following:

> It is possible that, in future periods, new information may become
> available relating to the amount of Honeywell's underlying asbestos-
> related liability payments and accounts payable as of December 31,
> 2018 that could cause the amount of the Indemnification Liability
> reported on our Consolidated and Combined Balance Sheets in this
> Annual Report on Form 10-K to change, possibly materially, which
> could lead to a restatement of our Consolidated and Combined
> Financial Statements.

If we are unable to remediate this material weakness or if we or our independent registered public accounting firm identify future deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, or in the event of any restatement of our Consolidated and Combined Financial Statements, the market price of shares of common stock could decline and we would be subject to sanctions or investigations by the SEC or other regulatory authorities, which could have a material adverse effect on our results of operations and financial condition.

257.   On April 18, 2019, Honeywell filed its Form 10-Q with the SEC reporting quarterly financial results for the period ended March 31, 2019 ("Q1:19 10-Q"). In discussing the Indemnification Agreement related to the Garrett spin-off, Honeywell's Q1:19 10-Q revealed that "[i]n our ongoing communications with Garrett with respect to the Agreement and Garrett's associated material weakness disclosure in its Form 10-K for the year ended December 31, 2018, Garrett has taken the position that (i) Honeywell has not satisfied all of its obligations under the Agreement, and (ii) the Agreement is unenforceable either in whole or in part."

258.   On December 2, 2019, Garrett filed a complaint with the Supreme Court of the State of New York, County of New York: Commercial Division "seek[ing] relief from an unenforceable and unconscionable indemnification agreement, which includes illegal covenants and purports to saddle Garrett with over a billion dollars in asbestos liability unrelated to its business." In that Complaint, Garrett alleges Adamczyk contrived the deal to spin-off Garrett to improve market perception of Honeywell by shifting over a billion dollars of

117

asbestos-related liability to Garrett through an indemnification agreement, unilaterally imposed on Garrett by Honeywell:

> *This action arises out of Honeywell's spin-off of Garrett in October 2018. The spin was architected and led by Honeywell's CEO, Darius Adamczyk. Honeywell and Adamczyk sought to use the spin **to convince the market that Honeywell's legacy Bendix-related asbestos liability, which well exceeded a billion dollars and had saddled the company for decades, would no longer impact Honeywell's balance sheet and <u>future earnings</u>.** To do this, Honeywell purported to give itself control over Garrett's strategic decision-making for thirty years through illegal covenants, and required Garrett to indemnify it for virtually all of Honeywell's legacy asbestos liability – despite the liability being unrelated to the Garrett's business.*
>
> ***
>
> *Because no company would ever voluntarily agree to such an arrangement, Honeywell did not actually negotiate the Indemnification Agreement with Garrett. Instead, Honeywell installed one of its own in-house lawyers (Su Ping Lu) as Garrett's president and sole director for the purpose of forcing these unconscionable terms on Garrett.*

(emphasis added).

259.   The Garrett Complaint and related material weakness Garrett itself identified and reported to the SEC support Plaintiffs' allegations of scienter and falsity during the Class Period because they evidence Defendants' scheme to materially understate its Bendix-related asbestos liabilities, in violation of GAAP, in order to facilitate a spin-off whereby Garrett would purportedly assume an obligation to pay 90% of those liabilities.

**M.     Loss Causation and Economic Harm**

260.   During the Class Period, Defendants deceived the market through a course of conduct that artificially inflated the price of Honeywell's common stock by misrepresenting the amount of its Bendix-related asbestos liabilities by over $1 billion. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Honeywell securities in response to company-specific news, Plaintiff and the other Class members suffered significant damages.

261.   During the Class Period, Defendants concealed from Plaintiff and other Class members the true extent of its Bendix-related asbestos liabilities and the sufficiency of its internal controls over financial reporting and public disclosures concerning the same. The 2017 10-K, Q1:18 10-Q, and Q2:18 10-Q each provided investors with a materially false and misleading account of the Company's estimated liability. As a result of these misrepresentations and/or omissions, Honeywell's stock price was artificially inflated during the Class Period.

262.   Honeywell disclosed the truth about its Bendix-related asbestos liabilities to the market in piecemeal fashion. First, on August 23, 2018, the Company stated it would need to "revise[] its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims" and indicated that its Bendix-

related asbestos liabilities would need to be increased by $1.083 billion (from $610 million to $1.693 billion as of June 30, 2018).

263.   Honeywell timed its August 23, 2018 announcement to coincide with a press release detailing several developments, including new information that 90% of Honeywell's Bendix asbestos and a subset of its environmental spending (net of 90% of related insurance receipts and certain other recoveries) is expected to be offset by future payments from its spin-offs, Garrett and Resideo. Honeywell also announced an upward revision of full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20). Accordingly, despite the significant increase in Bendix-related asbestos liabilities and Honeywell's disclosure regarding faulty internal accounting, "[n]et/net, [analysts] view[ed] today's news as positive, and expect[ed] the stock to outperform modestly on the back of the guidance raise and spin progress." Deutsche Bank, *Our Thoughts on HON's Guidance Raise* (Aug. 23, 2018). Analysts also focused on Honeywell's claim that "the accounting revision [would] have an immaterial positive impact to its full year 2018 adjusted EPS." RBC Capital Markets, *HON – Turbo and Homes Spins on Track; Boosts 2018 EPS Guidance by 5c/0.6%* (Aug. 23, 2018). Barclays considered the change in accounting treatment, but balanced it against the positive news regarding the indemnity agreement. "We restate historical HON financials for the accounting change related to Bendix asbestos liabilities and slightly increase 2018 core

120

forecasts….Our price target moves to $178 from $176 to reflect the change in estimates." Barclays, *Garrett & Resideo Form 10s are a Catalyst, Cash use is in Focus* (Aug. 24, 2018).

264.   Honeywell released its August 23, 2018 announcement about the Bendix liability and its August 23, 2018 press about the spin-offs both before market open, effectively burying the former under the latter. In so doing, Honeywell attempted to limit the drop of its stock price in response to the disclosure about its Bendix liability and maintain the artificial inflation that was present within its stock price at that time. However, despite Honeywell's efforts, the stock price declined, from an opening market price of $151.30 per share on August 23, 2018, to an unadjusted closing price of $150.97 per share on August 24, 2018.

265.   On October 10, 2018, during trading hours, the market learned additional information about Honeywell's Bendix-related asbestos liabilities when the SEC published its correspondence with Honeywell dated August 14, 2018 and August 20, 2018 on the SEC's EDGAR website. The correspondence disclosed in detail that Honeywell's internal controls for determining the Bendix-related asbestos liabilities had been deficient. The correspondence also contained admissions by Honeywell that it had been intentionally accounting for the liability improperly under "the authoritative accounting standard under U.S. GAAP

concerning loss contingencies." In response to this news, Honeywell's stock price declined from an opening market price of $155.76 on October 10, 2018 to an unadjusted closing price of $148.86 per share on October 11, 2018.

266.   Honeywell attempted to minimize the impact of this negative news in the market by announcing (and then holding) an Investor Showcase and Technology Demonstration for its spin-off Resideo, prior to market open, on the day the correspondence was made public. The correspondence with the SEC was not mentioned in this conference call, nor was any mention of the word asbestos made by any of the participants.

267.   On October 19, 2018, Honeywell was no longer able to keep investors in the dark about its Bendix liability accounting scheme. Before market hours, the Company released the Q3:18 10-Q which included the new Bendix-related asbestos liabilities figures as well as the fact that it received notice from the SEC on September 13, 2018 that it was under investigation by the SEC's Division of Enforcement.

268.   This was material news for Honeywell investors. On October 19, 2018, the *Wall Street Journal* published an article, titled *SEC Opens Investigation Into Honeywell's Asbestos Accounting*. The article stated that the "Securities and Exchange Commission ha[d] opened an investigation into the company's accounting for asbestos-related liabilities" following "discussions with the SEC

that prompted it to correct and restate its asbestos liabilities by about $1.1 billion more than its prior estimate." The *Wall Street Journal* included this article in its print edition on October 20, 2018 under the headline "SEC Opens Probe of Honeywell." *Reuters* published an article with similar language, adding "[t]he company has also revised its 2017 reported earnings per share lower by 14 cents to $2.00." The *Reuters* article was picked up by a number of other outlets, including *Business Insider*.

269.    *MarketWatch* published an article in the afternoon, before market close, titled "Honeywell's stock turns lower after SEC accounting investigation disclosed." The article stated:

> Shares of Honeywell International Inc … took an afternoon dive Friday, after the company disclosed that the Securities and Exchange Commission had opened an investigation into its accounting practices. The stock fell 0.7% in recent trade, after being up as much as 1.6% intraday after the diversified industrial company beat third-quarter earnings expectations. Honeywell said in its quarterly 10-Q filing that after a review of its accounting of accruals for the legacy Bendix asbestos-related liability for unasserted claims, the SEC advised Honeywell on Sept. 13 that an investigation was opened.

This article materially links the fall in stock price with the news that the SEC had launched an investigation into Honeywell's accounting practices. As the article notes, Honeywell simultaneously announced positive news, including that it had beat third-quarter earnings expectations.

270.    Analysts also took notice of the news about the SEC investigation. On

October 22, 2019 (the Monday following the disclosure, which occurred on a Friday), Barclays wrote:

> In Q318, the company revised its accounting to correct the time period associated with the determination of appropriate accruals for the Bendix asbestos-related liability for unasserted claims; the prior accounting treatment applied a five-year time horizon, while the new one reflects projections through 2059. Hence, the revised estimated asbestos-related liabilities are now $2.6bn as of December 2017, which is $1.1bn higher than the company's prior estimate. The insurance recoveries as of end-December 2017 were also revised higher. The cumulative impact on retained earnings was a decrease of $0.8bn.

> This revision followed the SEC's division of corporation finance 2017 10-K review, which included review of Bendix-related asbestos claims. On September 13, 2018, following the SEC Division of Corporation finance review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter.

271. Further evidence that the announcement regarding the SEC Investigation caused the drop in stock price is that the stock price increased when Honeywell announced the investigation had been closed without charges. Honeywell announced the SEC had closed its investigation into the accounting misstatements on the morning of August 29, 2019, and the announcement was picked up by several news outlets including *The Wall Street Journal*, *Bloomberg*, and *Seeking Alpha*. Honeywell did not announce any other news on that day. The stock price increased from $159.55 per share at close of market on August 28, 2019 to an unadjusted closing price of $164.62 per share at close of market on August 30, 2018.

272.   Following Honeywell's disclosure of the new Bendix liability figures and the SEC investigation, its stock price declined substantially. Honeywell's opening stock price on October 19, 2018, a Friday, was $151.26 per share. From there, it declined to an unadjusted market closing price of $147.88 per share on October 22, 2018 (the following trading day) and continued to fall further on October 23, 2018 ($14 adj. close) and October 24, 2018 ($).

273.   Defendants concealed material information from investors about Honeywell's Bendix-related asbestos liabilities. This deception misled the market about the risks of their investments in Honeywell. The SEC investigation, in particular, was a natural and foreseeable result from engaging in the accounting fraud alleged herein. As the truth concerning Defendants' accounting scheme came to light, Honeywell's stock price declined significantly. From a Class Period high of $161.28 per share, Honeywell's stock eventually fell to $140.83 per share following the end of the Class Period. The rise and fall of Honeywell's stock amounted to a total market capitalization loss of more than $14.8 billion.

274.   The timing of each price drop in Honeywell's stock, especially as the drops occurred after Honeywell announced otherwise positive news, negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' misstatements.

275. On August 23, 2018, the date Honeywell filed a Form 8-K announcing it had changed its accounting treatment of Bendix-related asbestos liabilities, it also announced that its new spin-offs, Garrett and Resideo, would pay 90% of Honeywell's asbestos and environmental expenses. On that same day, Honeywell also announced an upward revision of full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20). Likewise, on October 10, 2018, the day the SEC published its correspondence challenging Honeywell's accounting treatment of its asbestos liabilities, Honeywell announced and held an Investor Showcase and Technology Demonstration reporting positive news about its spin-off, Resideo. On October 19, 2018, Honeywell revealed it was under investigation by the SEC Division of Enforcement for its under-reporting of the Bendix-related asbestos liabilities. That same day, however, Honeywell filed its Q3:18 10-Q reporting positive growth and announcing the process of spinning-off Garrett and Resideo was on-track and nearing completion. On each of these days, the positive news should have caused the stock price to increase, yet the prices actually remained stable or declined. The timing of these price drops demonstrates the market learned the truth about Honeywell's accounting misstatements.

276. The decline in the price of Honeywell securities caused economic harm to Plaintiff and other Class members as the value of their investments declined due to the fraud alleged herein.

126

**N.    Presumption of Reliance; Fraud-On-The-Market.**

277.   At all relevant times, the market for Honeywell securities was an efficient market for the following reasons, among others:

a.    Honeywell's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b.    Honeywell communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.    Honeywell was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.    Unexpected material news about Honeywell was reflected in and incorporated into its stock price during the Class Period.

278.   As a result of the foregoing, the market for Honeywell securities promptly digested current information regarding Honeywell from all publicly available sources and reflected such information in Honeywell's stock price. Under these circumstances, all purchasers of Honeywell securities during the Class Period suffered similar injury through their purchase of Honeywell securities at artificially inflated prices, and a presumption of reliance applies.

279.   Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## O.   Additional Allegations Concerning Defendants' Actionable Statements and Omissions of Opinion

280.   Defendants' opinion statements omitted material facts about Defendants' inquiry into or knowledge concerning their statements of opinion. The omitted facts show the statements made by Defendants lacked the basis for making those statements that a reasonable investor would expect, even if Defendants subjectively held those opinions, which they did not. A reasonable investor in Honeywell expects not just that Defendants believe the opinions publicly stated

(however irrationally), but that they fairly align with the information in Defendants' possession at the time.

281.   Class members' expectations about the degree of certainty underlying an opinion is the function of the specificity of the opinion itself and the speaker's special knowledge that is unavailable to Class members. For statement of opinion, the proper analysis is what a reasonable person would naturally understand a statement to convey beyond its literal meaning. For opinion statements, this means considering the foundation investors would expect an issuer to have before making the statement. Where, as here, Defendants omitted material facts about their inquiry into or knowledge concerning their statements of opinion, and those facts conflict with what a reasonable investor would take from the statements themselves, the omissions create liability. Defendants knew at the time they made these statements of opinion particular facts the omission of which made the opinions at issue misleading to a reasonable person reading the statement fairly and in context.

282.   Defendants' choice of accounting treatments are statements of opinion. Indeed, Defendants themselves note in their 2017 10-K that "[t]he preparation of our consolidated financial statements in accordance with generally accepted accounting principles is based on the selection and application of accounting policies that require us to make significant estimates and assumptions

about the effects of matters that are inherently uncertain. We consider the accounting policies discussed below to be critical to the understanding of our financial statements." Directly thereafter, under the heading "Contingent Liabilities," the 2017 10-K states:

> We are subject to a number of lawsuits, investigations and claims (some of which involve substantial dollar amounts) that arise out of the conduct of our global business operations or those of previously owned entities, including matters relating to commercial transactions, government contracts, product liability (including asbestos), prior acquisitions and divestitures, employee benefit plans, intellectual property, legal and environmental, health and safety matters. We continually assess the likelihood of any adverse judgments or outcomes to our contingencies, as well as potential amounts or ranges of probable losses, and recognize a liability, if any, for these contingencies based on a thorough analysis of each matter with the assistance of outside legal counsel and, if applicable, other experts. Such analysis includes making judgments concerning matters such as the costs associated with environmental matters, the outcome of negotiations, the number and cost of pending and future asbestos claims, and the impact of evidentiary requirements. Because most contingencies are resolved over long periods of time, liabilities may change in the future due to new developments (including new discovery of facts, changes in legislation and outcomes of similar cases through the judicial system), changes in assumptions or changes in our settlement strategy." Further, in Note 19 to the 2017 10-K ("Commitments and Contingencies"), Defendants stated that "[i]n light of the uncertainties in inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating [Bendix] asbestos claims beyond the next five years." Defendants' accounting treatment for liabilities for unasserted Bendix-related asbestos claims overstated earnings. Those opinions imply that Defendants had a basis in fact to utilize the particular treatment and that Defendants were not in possession of facts that rebutted the opinion.

283.   In truth, Defendants had no reasonable basis for these opinions and possessed facts that rebutted them, as admitted by Tus in his August 20, 2018 letter to the SEC, stating that Defendants "inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

284.   Additionally, the Company's decision to use a five-year horizon was also contrary to industry practices, as evidenced by the accounting practices of other companies with asbestos-related litigation exposure.

**P.     No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine.**

285.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint because they are not forward-looking statements which are the only statements that can be protected by the statutory safe harbor.

286.   To the extent certain of the statements alleged to be misleading or

131

inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

287. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward looking statements," which they were not, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Honeywell who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present- tense statements when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

288. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

purchased or otherwise acquired Honeywell securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of Honeywell, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

289.   The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Honeywell common stock was actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by Honeywell or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of September 30, 2018, there were 740,288,303 shares of Honeywell common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

290.   Plaintiff's claims are typical of the claims of the Class members as all

Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

291.   Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

292.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, practices, policies and management of Honeywell;

c.    whether the Individual Defendants caused Honeywell to issue materially false and misleading statements during the Class Period;

d.    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

e.      whether the prices of Honeywell securities during the Class

Period were artificially inflated because of Defendants' conduct

complained of herein; and

f.      whether the Class members have sustained damages and, if so,

what is the proper measure of damages.

293.   A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it

impossible for Class members to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

**Against Defendants for Violations of Section 10(b) and Rule 10b-5**

294.   Plaintiff repeats and realleges each and every allegation contained

above as if fully set forth herein.

295.   This Count is asserted against defendants and is based upon Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder by the SEC.

296.   During the Class Period, Defendants engaged in a plan, scheme,

conspiracy and course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices and courses of business which operated as a

fraud and deceit upon Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Honeywell securities; and (iii) cause Plaintiff and the other Class members to purchase or otherwise acquire Honeywell securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

297.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Honeywell securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Honeywell's finances and business prospects.

298.   By virtue of their positions at Honeywell, Defendants had actual

136

knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

299.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Honeywell, the Individual Defendants had knowledge of the details of Honeywell's internal affairs.

300.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Honeywell. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Honeywell's businesses, operations, controls, future financial condition and future prospects. Defendants

Adamczyk and Szlosek certified pursuant to the Sarbanes-Oxley Act of 2002 that they reviewed the financial statements containing the misstatements described herein and that the information contained in the statements was accurate and truthful. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Honeywell securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Honeywell's accounting and controls which were concealed by defendants, Plaintiff and the other Class members purchased or otherwise acquired Honeywell securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

301.   During the Class Period, Honeywell securities were traded on an active and efficient market. Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Honeywell securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or

acquisitions by Plaintiff and the other Class members, the true value of Honeywell securities was substantially lower than the prices paid by Plaintiff and the other Class members. The market price of Honeywell securities declined sharply upon public disclosure of the facts alleged herein to have been misrepresented or omitted by Defendants to the injury of Plaintiff and other Class members.

302.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

303.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases, of Honeywell securities during the Class Period, upon the disclosure that it had been disseminating misrepresented facts about Honeywell and its business, controls, practices and policies to the investing public.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a)

304.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

305.   During the Class Period, the Individual Defendants participated in the operation and management of Honeywell, and conducted and participated, directly and indirectly, in the conduct of Honeywell's business affairs. Because of their

senior positions, they knew the adverse non-public information about Honeywell's misstatement of its accounting and controls.

306.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Honeywell's accounting and controls, and to correct promptly any public statements issued by Honeywell which had become materially false or misleading.

307.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Honeywell disseminated in the marketplace during the Class Period concerning Honeywell's accounting and controls. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Honeywell to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Honeywell within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Honeywell securities.

308.   Each of the Individual Defendants, therefore, acted as a controlling person of Honeywell. By reason of their senior management positions and/or being directors of Honeywell, each of the Individual Defendants had the power to direct

the actions of, and exercised the same to cause, Honeywell to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Honeywell and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other Class members complain.

309. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Honeywell.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

g.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative and its counsel as Class Counsel;

h.   Requiring Defendants to pay damages sustained by Plaintiff and the other Class members by reason of the acts and transactions alleged herein;

i.   Awarding Plaintiff and the other Class members pre-judgment and post-judgment interest, as well as their reasonable

141

attorneys' fees, expert fees and other costs; and

j.      Awarding such other and further relief as this Court may deem

just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

DATED: December 30, 2019          **KAHN SWICK & FOTI, LLC**

Kim E. Miller (*admitted pro hac vice*)
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498

-and-

Lewis S. Kahn (*pro hac vice motion forthcoming*)
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Lead Plaintiff
Charles M. Francisco, III and the Class*

and

**DECOTIIS, FITZPATRICK, COLE & GIBLIN, LLP**

*/s/ Vincent M. Giblin*
Vincent M. Giblin
Glenpointe Centre West
500 Frank W. Burr Boulevard, Suite 31
Teaneck, NJ 07666
Telephone: (201) 347-2136
Fax: (201) 928-0588

*Local Counsel for Lead Plaintiff
Charles M. Francisco, III and the Class*

## CERTIFICATION OF LEAD PLAINTIFF CHARLES M. FRANCISCO, III PURSUANT TO FEDERAL SECURITIES LAWS

I, Charles M. Francisco, III, duly certify and declare, as to the claims asserted under the federal securities laws, that:

1.      I have fully reviewed the facts of Lead Plaintiff Charles M. Francisco's Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") and adopt the allegations therein.

2.      I did not purchase securities of **Honeywell International Inc.** at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.      I am the Court-appointed Lead Plaintiff and will serve as a Class representative. I will monitor all aspects of this litigation and will participate in discovery, including producing relevant documents and sitting for a deposition, as needed.

4.      During the Class Period, I executed transactions in the securities of **Honeywell International Inc.** The transactions in the attached Schedule set forth all of my transactions in **Honeywell International Inc.** securities during the Class Period specified in the Complaint.

5.      In the last 3 years, I have not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

1

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:      December _30_, 2019

_____
Signature

_____
Printed Name

2

## Schedule of Lead Plaintiff's Class Period Transactions in Honeywell International Inc.

### Purchase(s):
### (Charles M. Francisco III; Account # 1)

| Trade Data | Settlement Date | Units | Price | Total Cost |
|---|---|---|---|---|
| 9/11/18 | 9/13/18 | 490 | $163.2754 | $80,004.95 |

### Purchase(s):
### (Charles M Francisco III; Account # 2)

| Trade Data | Settlement Date | Units | Price | Total Cost |
|---|---|---|---|---|
| 9/11/18 | 9/13/18 | 935 | $163.207 | $152,598.55 |

## <u>CERTIFICATE OF SERVICE</u>

I, Vincent M. Giblin, hereby certify that on December 30, 2019, I authorized the electronic filing of the foregoing amended complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Vincent M. Giblin*
Vincent M. Giblin